**LASERCOMB AMERICA, INC.,**
Plaintiff–Appellee,

v.

**Job REYNOLDS; Larry Holliday,**
Defendants–Appellants,

and

**Holiday Steel Rule Die
Corporation, Defendant.**

No. 89–3245.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1990.

Decided Aug. 16, 1990.

See also, D.C., 656 F.Supp. 612.

Boris Haskell, argued Paris and Haskell, Arlington, Va., for defendants-appellants.

Lee Carl Bromberg, argued (Judith R.S. Stern, on brief), Bromberg & Sunstein, Boston, Mass., for plaintiff-appellee.

Before WIDENER and SPROUSE, Circuit Judges, and HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

SPROUSE, Circuit Judge:

Appellants Larry Holliday and Job Reynolds appeal from a district court judgment holding them liable to appellee Lasercomb America, Inc., for copyright infringement and for fraud, based on appellants' unauthorized copying and marketing of appellee's software. We affirm in part, reverse in part, and remand for recomputation of damages.

I

*Facts and Proceedings Below*

Appellants and defendants below are Larry Holliday, president and sole shareholder of Holiday Steel Rule Die Corpora-

tion (Holiday Steel), and Job Reynolds, a computer programmer for that company.[1] Appellee is Lasercomb America, Inc. (Lasercomb), the plaintiff below. Holiday Steel and Lasercomb were competitors in the manufacture of steel rule dies that are used to cut and score paper and cardboard for folding into boxes and cartons. Lasercomb developed a software program, Interact, which is the object of the dispute between the parties. Using this program, a designer creates a template of a cardboard cutout on a computer screen and the software directs the mechanized creation of the conforming steel rule die.[2]

In 1983, before Lasercomb was ready to market its Interact program generally, it licensed four prerelease copies to Holiday Steel which paid $35,000 for the first copy, $17,500 each for the next two copies, and $2,000 for the fourth copy. Lasercomb informed Holiday Steel that it would charge $2,000 for each additional copy Holiday Steel cared to purchase. Apparently ambitious to create for itself an even better deal, Holiday Steel circumvented the protective devices Lasercomb had provided with the software and made three unauthorized copies of Interact which it used on its computer systems. Perhaps buoyed by its success in copying, Holiday Steel then created a software program called "PDS–1000," which was almost entirely a direct copy of Interact, and marketed it as its own CAD/CAM die-making software. These infringing activities were accomplished by Job Reynolds at the direction of Larry Holliday.

There is no question that defendants engaged in unauthorized copying, and the purposefulness of their unlawful action is manifest from their deceptive practices. For example, Lasercomb had asked Holiday Steel to use devices called "chronoguards" to prevent unauthorized access to Interact. Although defendants had deduced how to circumvent the chronoguards and had removed them from their computers, they represented to Lasercomb that the chrono-

---

1. Holiday Steel was a defendant below but it is now bankrupt and is not a party to this appeal.

2. This genre of software is called CAD/CAM, which stands for "computer assisted design and computer assisted manufacture."

guards were in use. Another example of subterfuge is Reynolds' attempt to modify the PDS–1000 program output so it would present a different appearance than the output from Interact.

When Lasercomb discovered Holiday Steel's activities, it registered its copyright in Interact and filed this action against Holiday Steel, Holliday, and Reynolds on March 7, 1986. Lasercomb claimed copyright infringement, breach of contract, misappropriation of trade secret, false designation of origin, unfair competition, and fraud. Defendants filed a number of counterclaims. On March 24, 1986, the district court entered a preliminary injunction, enjoining defendants from marketing the PDS–1000 software.

The procedural history of this case is complex, with various claims and defenses experiencing both death and resurrection on various pretrial motions and at the bench trial itself. For purposes of this appeal it suffices to say that, ultimately, all of the counterclaims were dismissed; Lasercomb's claims of misappropriation of trade secret, false designation of origin, and unfair competition were dismissed as preempted by the Copyright Act; the court found the defendants liable to Lasercomb for copyright infringement, rejecting their affirmative defenses of misuse of copyright and lack of statutory copyright notice; and the court held for Lasercomb on its claims of breach of contract and fraud.

The district court awarded Lasercomb $105,000 in actual damages for copyright infringement and for fraud[3]—with Holiday Steel, Holliday, and Reynolds jointly and severally liable—plus $10,000 against Holli-

day and $5,000 against Reynolds as punitive damages on the fraud claim.[4] All defendants were permanently enjoined from publishing and marketing the PDS–1000 software.

Holliday and Reynolds raise several issues on appeal. They do not dispute that they copied Interact, but they contend that Lasercomb is barred from recovery for infringement by its concomitant culpability. They assert that, assuming Lasercomb had a perfected copyright, it impermissibly abused it. This assertion of the "misuse of copyright" defense is based on language in Lasercomb's standard licensing agreement, restricting licensees from creating any of their own CAD/CAM die-making software.[5] Appellants also argue that the district court's finding of fraud was erroneously based on facts not alleged in the complaint. Finally, they contend that, even if they are liable, the district court erred in the calculation of damages. We consider these issues *seriatim.*

## II

### *Misuse of Copyright Defense*

A successful defense of misuse of copyright bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright. Here, appellants claim Lasercomb has misused its copyright by including in its standard licensing agreement clauses which prevent the licensee from participating in any manner in the creation of computer-assisted die-making software.[6] The offending paragraphs read:

**3.** The court found Lasercomb was damaged in the amount of $105,000 on the copyright infringement claim, and was damaged in the amount of $105,000 on the fraud claim. Because those two damages amounts arose from lost sales of the same three Interact copies, the court ruled Lasercomb could recover only once.

**4.** Additional actual and punitive damages were awarded against the corporation severally. Because damages for the breach of contract were awarded against the corporation only, issues relating to that cause of action are not raised in this appeal.

**5.** Appellants raise two other defenses to copyright infringement. They claim Lasercomb's recovery is barred by their failure to comply with statutory notice requirements in perfecting the copyright. Somewhat incongruously, appellants alternatively advance the defense of innocent infringement. Because of our disposition of the copyright misuse defense, we do not reach these other two defenses to infringement.

**6.** Appellants also claim Lasercomb has created an illegal tie-in by discounting the price of Interact to licensees who purchase steel rule dies and other goods from Lasercomb. This simply is not a tie-in. No customer is required to buy

D. Licensee agrees during the term of this Agreement that it will not permit or suffer its directors, officers and employees, directly or indirectly, to write, develop, produce or sell computer assisted die making software.

E. Licensee agrees during the term of this Agreement and for one (1) year after the termination of this Agreement, that it will not write, develop, produce or sell or assist others in the writing, developing, producing or selling computer assisted die making software, directly or indirectly without Lasercomb's prior written consent. Any such activity undertaken without Lasercomb's written consent shall nullify any warranties or agreements of Lasercomb set forth herein.

The "term of this Agreement" referred to in these clauses is ninety-nine years.

Defendants were not themselves bound by the standard licensing agreement. Lasercomb had sent the agreement to Holiday Steel with a request that it be signed and returned. Larry Holliday, however, decided not to sign the document, and Lasercomb apparently overlooked the fact that the document had not been returned.[7] Although defendants were not party to the restrictions of which they complain, they proved at trial that at least one Interact licensee had entered into the standard agreement, including the anticompetitive language.[8]

The district court rejected the copyright misuse defense for three reasons. First, it noted that defendants had not explicitly agreed to the contract clauses alleged to constitute copyright misuse. Second, it found "such a clause is reasonable in light of the delicate and sensitive area of computer software." And, third, it questioned whether such a defense exists. We consider the district court's reasoning in reverse order.

## A. Does a "Misuse of Copyright" Defense Exist?

We agree with the district court that much uncertainty engulfs the "misuse of copyright" defense.[9] We are persuaded, however, that a misuse of copyright defense is inherent in the law of copyright just as a misuse of patent defense is inherent in patent law.

The misuse of a patent is a potential defense to suit for its infringement, and both the existence and parameters of that body of law are well established. *E.g.,* *United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465 (1957); *see generally* 8 E. Lipscomb, *Lipscomb's Walker on Patents* §§ 28:32–28:36 (3d ed. 1989) [hereinafter *Walker on Patents*]; Calkins, *Patent Law: The Impact of the 1988 Patent Misuse Reform Act and Noerr–Pennington Doctrine on Misuse Defenses and Antitrust Counterclaims,* 38 Drake L.Rev. 175 (1989) [hereinafter Calkins, *Patent Law*]. Although there is little case law on the subject, courts from time to time have intimated that the similarity of rationales underlying the law of patents and the law of copyrights argues for a defense to an infringement of copyright based on misuse

steel rule dies in order to be able to purchase the Interact software, nor must any customer buy the Interact software in order to purchase steel rule dies, nor does Lasercomb require customers to agree to not purchase any other vendor's wares in order to be able to purchase Lasercomb's software and dies. *See Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5–6 & n. 4, 78 S.Ct. 514, 518 & n. 4, 2 L.Ed.2d 545 (1958).

7. The district court's finding of breach of contract (not before us on appeal) was based on a letter in which Holliday admitted an oral agreement between Holiday Steel and Lasercomb was binding.

8. At the time of trial, Lasercomb had sold approximately 40 licenses in Interact. Laser-

comb's president testified that the terms of the licensing agreement, including the noncompete language, were negotiable. He stated the noncompete language had been negotiated out or modified in "several" instances, but could not specifically state the degree to which the language had been removed or altered.

9. *See generally* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.09[A] (1989) [hereinafter *Nimmer on Copyright*]; Gibbs, *Copyright Misuse: Thirty Years Waiting for the Other Shoe,* 23 Copyright L.Symp. (ASCAP) 31 (1977); Fine, *Misuse and Antitrust Defenses to Copyright Infringement Actions,* 17 Hastings L.J. 315 (1965).

of the copyright. *E.g., United States v. Loew's, Inc.*, 371 U.S. 38, 44–51, 83 S.Ct. 97, 101–05, 9 L.Ed.2d 11 (1962); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 157–59, 68 S.Ct. 915, 929–30, 92 L.Ed. 1260 (1948); *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 865 & n. 27 (5th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980). The origins of patent and copyright law in England, the treatment of these two aspects of intellectual property by the framers of our Constitution, and the later statutory and judicial development of patent and copyright law in this country persuade us that parallel public policies underlie the protection of both types of intellectual property rights. We think these parallel policies call for application of the misuse defense to copyright as well as patent law.

1. Overview

Because of the paucity of precedent in the copyright misuse area, some historical perspective of the elements underlying intellectual property law is helpful to our inquiry. Fortunately, respected treatise authors have captured well the essence of the relevant historical perspective.

During the sixteenth century, it became common for the English Crown to grant "letters patent"[10] which gave individuals exclusive rights to produce, import and/or sell given items within the kingdom. 1 *Walker on Patents* §§ 1:1–1:2. These monopolies were granted for such commonplace items as salt, vinegar, and calfskins, to name but a few. *Id.* at § 1:2. The practice of granting monopolies led to widespread abuses, such as shortages and inflated prices for items that would otherwise be easily and cheaply available. *Id.* Consequently, Parliament passed the Statute of Monopolies (1623–24),[11] prohibiting the creation of such monopolies by the

Crown. *Id.* at § 1.5. An exception was made, however, to permit a patent to be granted for a period of fourteen years to the creator of a new invention. 21 Jac., ch. 3, § 6.

The rationale for allowing patents for new inventions was and is to encourage their creation for the benefit of society. 1 *Walker on Patents* § 1:6. The monopolies granted by the Crown had been odious because they restrained trade in articles that had previously been a part of the public domain. An invention, however, does not withdraw anything from public traffic; rather, it introduces something new. To encourage and reward inventors for increasing the inventory of useful objects, the government grants them, for a limited time, the right to exclude others from making and selling their inventions. *Id.; United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933).

The development of copyright law in England likewise grew out of a differentiation by Parliament between a monopoly that restricts publication of works and a limited copyright that encourages the efforts of authors. In sixteenth-century England, the Crown granted to the Stationers' Company the exclusive right to publish and print all published works (apparently to enable censorship of Protestant materials). In the early 1700s, the Stationer's Company petitioned Parliament to recognize that these rights inured to it in perpetuity. Instead, Parliament passed the Statute of Anne (1709–10),[12] the first known copyright legislation. A. Latman, *The Copyright Law: Howell's Copyright Law Revised and the 1976 Act* 2–3 (5th ed. 1979) [hereinafter *Howell's Copyright Law*]; R. Bowker, *Copyright: Its History and Its Law* 21–23 (1912). That statute gave authors the sole right of publication for up to

---

**10.** From the Latin *patentes* meaning open or accessible. Thus, letters patent were documents left open for examination by the public. 1 *Walker on Patents* § 1:1.

**11.** An Act concerning Monopolies and Dispensations with Penal Laws, and the Forfeitures thereof, 21 Jac., ch. 3.

**12.** An Act for the Encouragement of Learning, by vesting the Copies of printed Books in the Authors or Purchasers of such Copies, during the Times therein mentioned, 8 Anne, ch. 19.

twenty-eight years. Thus, the English statutory treatment of copyright was similar to that of patent in that it granted the creator a monopoly for a limited time only.

It is significant, we think, that the framers of our Constitution continued the English development of intellectual property law and considered in tandem those property rights protectable by copyrights and those protectable by patents. In giving Congress the power to create copyright and patent laws, the framers combined the two concepts in one clause, stating a unitary purpose—to promote progress. Article I, section 8, clause 8 of the United States Constitution provides:

> [The Congress shall have power] To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

This clause was adopted without debate, and material explaining the intention of the framers is limited. However, a comment in *The Federalist* papers indicates the public policy behind the grant of copyright and patent powers is essentially the same:

> The utility of this power will scarcely be questioned. The copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law. The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals.

*The Federalist*, No. 43 at 279 (J. Madison) (Mod.Lib. ed. 1941).[13]

Supreme Court comment has likewise equated the public policies of copyright and patent. For example, in *Mazer v. Stein*,

347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1953), the Supreme Court stated:

> The economic philosophy behind the clause empowering Congress to grant *patents and copyrights* is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in "Science and useful Arts." Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.

(Emphasis added.) *See also Loew's*, 371 U.S. at 44–51, 83 S.Ct. at 101–05; *Paramount Pictures*, 334 U.S. at 154–59, 68 S.Ct. at 927–29. The philosophy behind copyright, parallel to that discussed above for patent, is that the public benefits from the efforts of authors to introduce new ideas and knowledge into the public domain. To encourage such efforts, society grants authors exclusive rights in their works for a limited time.

2. The Misuse of Patent Defense

Although a patent misuse defense was recognized by the courts as early as 1917,[14] most commentators point to *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), as the foundational patent misuse case. In that case, the plaintiff Morton Salt brought suit on the basis that the defendant had infringed Morton's patent in a salt-depositing machine. The salt tablets were not themselves a patented item, but Morton's patent license required that licensees use only salt tablets produced by Morton. Morton was thereby using its patent to restrain competition in the sale of an item which was not within the scope of the patent's privilege. The Supreme Court held that, as a court of

---

**13.** The Court of Customs and Patent Appeals observed that the patent/copyright clause was unusual in stating the reason the power had been granted, and commented:

> Its inclusion doubtlessly was due to the fact that those who formulated the Constitution were familiar with the long struggle over monopolies so prominent in English history, where exclusive rights to engage even in ordinary business activities were granted so frequently by the Crown for the financial benefits accruing to the Crown only. It was de-

sired that in this country any Government grant of a monopoly for even a limited time should be limited to those things which serve in the promotion of science and the useful arts.

*In Re Shao Wen Yuan*, 188 F.2d 377, 380 (C.C.P.A.1951). *See also Howell's Copyright Law*, at 15.

**14.** *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). For a history of the patent misuse defense, see Calkins, *Patent Law*, at 178–92.

equity, it would not aid Morton in protecting its patent when Morton was using that patent in a manner contrary to public policy. *Id.* at 490–92, 62 S.Ct. at 404–05. The Court stated:

> The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful Arts, by securing for limited Times to ... Inventors the exclusive Right ..." to their "new and useful" inventions. United States Constitution, Art. I, § 8, cl. 8, 35 U.S.C. § 31. But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant.

*Id.* at 492, 62 S.Ct. at 405. Thus, the Supreme Court endorsed "misuse of patent" as an equitable defense to a suit for infringement of that patent.

Since *Morton Salt,* the courts have recognized patent misuse as a valid defense and have applied it in a number of cases in which patent owners have attempted to use their patents for price fixing, tie-ins, territorial restrictions, and so forth. *See* Calkins, *Patent Law,* at 187–89 n. 38, 8 *Walker on Patents* §§ 28:32–28:36; W. Holmes, *Intellectual Property and Antitrust Law* § 1.07 (1989) [hereinafter Holmes, *Intellectual Property*]. The patent misuse defense also has been acknowledged by Congress in the 1988 Patent Misuse Reform Act, Pub.L. No. 100–703, 102 Stat. 4676 (1988) (codified at 35 U.S.C. § 271(d)(4) &

(5)), which limited but did not eliminate the defense.[15]

### 3. The "Misuse of Copyright" Defense

Although the patent misuse defense has been generally recognized since *Morton Salt,* it has been much less certain whether an analogous copyright misuse defense exists. *See supra* note 9. This uncertainty persists because no United States Supreme Court decision has firmly established a copyright misuse defense in a manner analogous to the establishment of the patent misuse defense by *Morton Salt.* The few courts considering the issue have split on whether the defense should be recognized, *see* Holmes, *Intellectual Property* § 4.09 (collecting cases), and we have discovered only one case which has actually applied copyright misuse to bar an action for infringement. *M. Witmark & Sons v. Jensen,* 80 F.Supp. 843 (D.Minn.1948), *appeal dismissed,* 177 F.2d 515 (8th Cir.1949).

We are of the view, however, that since copyright and patent law serve parallel public interests, a "misuse" defense should apply to infringement actions brought to vindicate either right. As discussed above, the similarity of the policies underlying patent and copyright is great and historically has been consistently recognized. Both patent law and copyright law seek to increase the store of human knowledge and arts by rewarding inventors and authors with the exclusive rights to their works for a limited time. At the same time, the granted monopoly power does not extend to property not covered by the patent or copyright. *Morton Salt,* 314 U.S. at 492, 62 S.Ct. at 405; *Paramount Pictures,* 334 U.S. at 156–58, 68 S.Ct. at 928–29;[16] *cf. Baker v. Selden,* 101 U.S. 99, 101–04, 25 L.Ed. 841 (1880).

---

**15.** The primary effect of the Patent Misuse Reform Act is to eliminate the presumption that use of a patent license to create a tie-in is *per se* misuse. *See* Calkins, *Patent Law,* at 196–97.

**16.** In *Paramount Pictures,* the Court in an antitrust context stated:

> Block-booking [of feature films] prevents competitors from bidding for single features on their individual merits. The District Court held it illegal for that reason and for the reason that it "adds to the monopoly of a

single copyrighted picture that of another copyrighted picture which must be taken and exhibited in order to secure the first." That enlargement of the monopoly of the copyright was condemned below in reliance on the principle which forbids the owner of a patent to condition its use on the purchase or use of patented or unpatented materials. The court enjoined defendants from performing or entering into any license in which the right to

Thus, we are persuaded that the rationale of *Morton Salt* in establishing the misuse defense applies to copyrights. In the passage from *Morton Salt* quoted above, the phraseology adapts easily to a copyright context:

> The grant to the [author] of the special privilege of a [copyright] carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful Arts, by securing for limited Times to [Authors] ... the exclusive Right ..." to their ["original" works]. United States Constitution, Art. I, § 8, cl. 8, [17 U.S. C.A. § 102]. But the public policy which includes [original works] within the granted monopoly excludes from it all that is not embraced in the [original expression]. It equally forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant.

*Cf. Morton Salt,* 314 U.S. at 492, 62 S.Ct. at 405.

Having determined that "misuse of copyright" is a valid defense, analogous to the misuse of patent defense, our next task is to determine whether the defense should have been applied by the district court to bar Lasercomb's infringement action against the defendants in this case.

## B. The District Court's Finding that the Anticompetitive Clauses Are Reasonable

In declining to recognize a misuse of copyright defense, the district court found "reasonable" Lasercomb's attempt to protect its software copyright by using anticompetitive clauses in their licensing agreement. In briefly expressing its reasoning, the court referred to the "delicate and sensitive" nature of software. It also observed that Lasercomb's president had testified that the noncompete language was negotiable.

If, as it appears, the district court analogized from the "rule of reason" concept of antitrust law, we think its reliance on that principle was misplaced. Such reliance is, however, understandable. Both the presentation by appellants and the literature tend to intermingle antitrust and misuse defenses.[17] *E.g.*, Holmes, *Intellectual Property*, at § 4.09. A patent or copyright is often regarded as a limited monopoly— an exception to the general public policy against restraints of trade.[18] Since antitrust law is the statutory embodiment of that public policy, there is an understandable association of antitrust law with the misuse defense. Certainly, an entity which uses its patent as the means of violating

---

exhibit one feature is conditioned upon the licensee's taking one or more other features. We approve that restriction.

334 U.S. at 156–58, 68 S.Ct. at 928–29 (citations and footnote omitted). Citing *Paramount,* the Fifth Circuit has opined in dicta that "[i]t is ... likely that the public monopoly extension rationale of *Morton Salt* ... is applicable to copyright." *Mitchell,* 604 F.2d at 865 n. 27.

**17.** In the context of copyright, this confusion probably arises at least in part from *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). In that case, CBS brought an antitrust suit and also asked for a declaratory judgment that defendant's action constituted misuse of copyright. The Second Circuit first addressed whether there was an antitrust violation, and finding there was, "the Court of Appeals held that the challenged conduct constituted misuse of copyrights solely on the basis of its finding of unlawful price fixing." *Id.* at 6 n. 9, 99 S.Ct. at 1555 n. 9. The Supreme Court reversed the finding of a Sherman Act violation— on the basis that the court of appeals had used the wrong standard to evaluate the price fixing

—stating: "We reverse that judgment, and the copyright misuse judgment dependent upon it...." *Id.* at 24, 99 S.Ct. at 1565. Standing alone, this latter sentence seems to imply that copyright misuse depends on a finding of an antitrust violation. In context, however, it is apparent that misuse was linked to antitrust in that case simply as a matter of litigation strategy. Copyright misuse was not asserted as a defense to an infringement suit, and the primary claim was an antitrust claim.

**18.** For example, Calkins states, "The essence of every patent is the power to exclude, that is, monopoly power." Calkins, *Patent Law,* at 176 n. 1. But see 1 *Walker on Patents* ch. 1, which repeatedly distinguishes a monopoly, which withdraws a previously public item from the public domain, from a patent, which protects for a limited time a new item which is then added to the public domain. *See also Dubilier Condenser,* 289 U.S. at 186, 53 S.Ct. at 557; Holmes, *Intellectual Property,* at § 1.02.

antitrust law is subject to a misuse of patent defense. However, *Morton Salt* held that it is not necessary to prove an antitrust violation in order to successfully assert patent misuse:

> It is unnecessary to decide whether respondent has violated the Clayton Act, for we conclude that in any event the maintenance of the present suit to restrain petitioner's manufacture or sale of the alleged infringing machines is contrary to public policy and that the district court rightly dismissed the complaint for want of equity.

314 U.S. at 494, 62 S.Ct. at 406. *See also Hensley Equip. Co. v. Esco Corp.*, 383 F.2d 252, 261 & n. 19, *amended on reh'g*, 386 F.2d 442 (5th Cir.1967); 8 *Walker on Patents*, at § 28:33.

So while it is true that the attempted use of a copyright to violate antitrust law probably would give rise to a misuse of copyright defense, the converse is not necessarily true—a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action. The question is not whether the copyright is being used in a manner violative of antitrust law (such as whether the licensing agreement is "reasonable"), but whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright.

Lasercomb undoubtedly has the right to protect against copying of the Interact code. Its standard licensing agreement, however, goes much further and essentially attempts to suppress any attempt by the licensee to independently implement the idea which Interact expresses.[19] The

agreement forbids the licensee to develop or assist in developing *any* kind of computer-assisted die-making software. If the licensee is a business, it is to prevent all its directors, officers and employees from assisting in any manner to develop computer-assisted die-making software. Although one or another licensee might succeed in negotiating out the noncompete provisions, this does not negate the fact that Lasercomb is attempting to use its copyright in a manner adverse to the public policy embodied in copyright law, and that it has succeeded in doing so with at least one licensee. *See supra* note 8 and accompanying text. *Cf. Berlenbach v. Anderson & Thompson Ski Co.*, 329 F.2d 782, 784–85 (9th Cir.), *cert. denied*, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964).

The language employed in the Lasercomb agreement is extremely broad. Each time Lasercomb sells its Interact program to a company and obtains that company's agreement to the noncompete language, the company is required to forego utilization of the creative abilities of all its officers, directors and employees in the area of CAD/CAM die-making software. Of yet greater concern, these creative abilities are withdrawn from the public.[20] The period for which this anticompetitive restraint exists is ninety-nine years, which could be longer than the life of the copyright itself.[21]

We previously have considered the effect of anticompetitive language in a licensing agreement in the context of patent misuse. *Compton v. Metal Products, Inc.*, 453 F.2d 38 (4th Cir.1971), *cert. denied*, 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972).

---

**19.** A copyright, of course, protects only the expression of an idea (the Interact code), and not the idea itself (using CAD/CAM software to make steel rule dies). 17 U.S.C. § 102(b); *Mazer v. Stein*, 347 U.S. at 217, 74 S.Ct. at 470; *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434–37 (4th Cir.1986).

**20.** *Cf. Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975):

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the pub-

lic interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts. The immediate effect of our copyright law is to secure a fair return for an "author's" creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.

(Footnotes omitted.) *See also* 1 *Nimmer on Copyright*, at § 1.03[A].

**21.** In general, copyrights last for the life of the author plus 50 years. 17 U.S.C. § 302(a).

Compton had invented and patented coal auguring equipment. He granted an exclusive license in the patents to Joy Manufacturing, and the license agreement included a provision that Compton would not "engage in any business or activity relating to the manufacture or sale of equipment of the type licensed hereunder" for as long as he was due royalties under the patents. Suit for infringement of the Compton patents was brought against Metal Products, and the district court granted injunctive relief and damages. On appeal we held that relief for the infringement was barred by the misuse defense, stating:

> The need of Joy to protect its investment does not outweigh the public's right under our system to expect competition and the benefits which flow therefrom, and the total withdrawal of Compton from the mining machine business ... everywhere in the world for a period of 20 years unreasonably lessens the competition which the public has a right to expect, and constitutes misuse of the patents.

*Id.* at 45. *Cf. Berlenbach, supra* (applying misuse doctrine where license to sell patented ski bindings prohibited licensee from manufacturing or selling any competing ski binding).

We think the anticompetitive language in Lasercomb's licensing agreement is at least as egregious as that which led us to bar the infringement action in *Compton,* and therefore amounts to misuse of its copyright. Again, the analysis necessary to a finding of misuse is similar to but separate from the analysis necessary to a finding of antitrust violation. The misuse arises from Lasercomb's attempt to use its copyright in a particular expression, the Interact software, to control competition in an area outside the copyright, *i.e.,* the idea of computer-assisted die manufacture, regardless of whether such conduct amounts to an antitrust violation.

## C. The Effect of Appellants Not Being Party to the Anticompetitive Contract

In its rejection of the copyright misuse defense, the district court emphasized that Holiday Steel was not explicitly party to a licensing agreement containing the offending language. However, again analogizing to patent misuse, the defense of copyright misuse is available even if the defendants themselves have not been injured by the misuse. In *Morton Salt,* the defendant was not a party to the license requirement that only Morton-produced salt tablets be used with Morton's salt-depositing machine. Nevertheless, suit against defendant for infringement of Morton's patent was barred on public policy grounds. Similarly, in *Compton,* even though the defendant Metal Products was not a party to the license agreement that restrained competition by Compton, suit against Metal Products was barred because of the public interest in free competition. *See also Hensley Equip. Co.,* 383 F.2d at 261; *cf. Berlenbach,* 329 F.2d at 784–85.

Therefore, the fact that appellants here were not parties to one of Lasercomb's standard license agreements is inapposite to their copyright misuse defense. The question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative.

In sum, we find that misuse of copyright is a valid defense, that Lasercomb's anticompetitive clauses in its standard licensing agreement constitute misuse of copyright, and that the defense is available to appellants even though they were not parties to the standard licensing agreement. Holding that Lasercomb should have been barred by the defense of copyright misuse from suing for infringement of its copyright in the Interact program, we reverse the injunction and the award of damages for copyright infringement.[22]

---

**22.** This holding, of course, is not an invalidation of Lasercomb's copyright. Lasercomb is free to bring a suit for infringement once it has purged itself of the misuse. *Cf. United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 465 (1957); *Hensley Equipment Co.,* 383 F.2d at 261, 386 F.2d at 443.

Because of this holding, we do not reach the other defenses to copyright infringement advanced by appellants.

## III

### Finding of Fraud

■ The complaint alleged that defendants committed fraud "at the time they sought to purchase a license to use the software at the Holiday plant" by representing to Lasercomb that they would preserve Lasercomb's copyright and proprietary rights in Interact. The district court found Lasercomb had established fraud by showing that defendants made various false representations on which Lasercomb reasonably relied in continuing its relationship with Holiday Steel, thereby giving defendants the opportunity to make the unlawful copies. On appeal, Holliday and Reynolds contend that the district court erred in finding fraud on the basis of incidents which were not alleged in the complaint; that is, the false representations found by the court occurred after the time of the events alleged in the complaint.

Appellants point to Rule 9(b) of the Federal Rules of Civil Procedure, which requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, a complaint which fails to specifically allege the time, place and nature of the fraud is subject to dismissal on a Rule 12(b)(6) motion. However, once the case has actually gone to trial, the issue of fraud is within the ambit of Rule 15(b): "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

Appellants made no objection below to the introduction of the evidence which proved fraud at times after Interact was purchased, nor have they averred that their failure to object resulted from a reasonable belief that the evidence was introduced in support of some other issue being litigated.

Therefore, the issues of fraud after the purchase of Interact were properly treated as if raised in the pleadings, and we affirm the district court's finding of fraud. Fed. R.Civ.P. 15(b); see Federal Mut. Ins. Co. v. Deal, 239 F.Supp. 618, 621 (S.D.W.Va. 1965); Strand v. Librascope, Inc., 197 F.Supp. 743, 744 (E.D.Mich.1961); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1300 (1969); cf. Consolidated Data Terminals v. Applied Digital Data Sys., 708 F.2d 385, 396 (9th Cir.1983) (even if pleadings never amended, judgment stands if issue tried by express or implied consent).

## IV

### Calculation of Damages

The district court calculated Lasercomb's damages on the basis of the three copies of Interact that defendants made and used without authorization and without payment to Lasercomb.[23] The district court calculated the damages based on the cost of a copy of Interact to a first-time user, i.e., $35,000. Multiplying this amount by three, the district court arrived at actual damages of $105,000 assessed once for the count of copyright infringement and again for the count of fraud. The court, however, properly ruled that Lasercomb could recover the $105,000 only once. See Clifford v. River Bend Plantation, Inc., 55 N.C.App. 514, 522, 286 S.E.2d 352, 356 (1982). The district court also awarded punitive damages on the fraud count against Holliday and Reynolds in the amounts of $10,000 and $5,000 respectively.

Having avoided the Charybdis of damages for copyright infringement by the misuse defense, appellants are now confronted with the Scylla of yet the same amount of damages for their fraudulent actions. This they face by challenging the

Although we find misuse of copyright, we reject the contention of appellants—that they should recover attorney fees from Lasercomb under 17 U.S.C. § 505 because Lasercomb brought this action in bad faith. Given the conduct of defendants and the obscurity of their defenses, we find such a position completely untenable.

**23.** Separate damages were awarded against Holiday Steel severally to account for profits realized by sale of the infringing PDS–1000 software. These damages are not at issue in this appeal.

 

court's calculation, claiming that, as to *them,* the cost of a copy of Interact was $2,000 rather than $35,000. We agree that the district court's approach was erroneous under the principles of North Carolina law.[24]

■ In North Carolina, "the goal sought in awarding damages is 'to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money.' " *Quate v. Caudle,* 95 N.C.App. 80, 87, 381 S.E.2d 842, 846 (1989) (quoting *Phillips v. Chesson,* 231 N.C. 566, 571, 58 S.E.2d 343, 347 (1950)), *rev. denied,* 325 N.C. 709, 388 S.E.2d 462 (1989). Alternatively stated, "The goal of the law of damages is to place an injured party in as nearly the same position as he would have been had he not been injured." *Cates v. Wilson,* 321 N.C. 1, 7, 361 S.E.2d 734, 738 (1987).

■ The district court stated, "Plaintiff's actual damages may be measured by its lost sales." This is a generally correct statement of North Carolina law. However, by using a figure of $35,000, the court evidently was considering loss of sales to persons other than Holiday Steel. Due to the nature of software, however, Lasercomb could have sold copies to any other interested buyer notwithstanding defendants' copying, so it is difficult to discern how Lasercomb could have lost sales to prospective buyers—other than Holiday Steel—on account of the copying. Thus, damages can be properly measured only by consideration of lost sales *to Holiday Steel.*

On August 2, 1983, Lasercomb sent a letter to Holiday Steel which stated that the charge for all future software licenses would be $2,000.[25] Appellants therefore assert that, had Holiday Steel properly purchased the three Interact copies rather than copying them, Lasercomb would have received $6,000. Lasercomb contends that "it would be a perversion of justice to allow" appellants the benefit of the "dis-

count," given their intentional infringement and fraudulent actions. Appellants' wrongful actions, however, have bearing on the *actual* damages only if those actions induced Lasercomb to lower its price to $2,000; otherwise, the wrongful actions are relevant only to assessment of punitive damages.

The district court did not specifically find whether the $2,000 price was a product of business decisions that were unaffected by any fraudulent activity taking place, or whether (and, if so, to what extent) appellants obtained that favorable price only through its wrongful actions. Even if the price were $2,000 only because of fraud, however, it appears $35,000 per copy still would not be the proper amount of damages. Defendants submitted evidence that, under Lasercomb's standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000. We therefore vacate the judgment for $105,000 and remand for the district court to determine what amount Holiday Steel would have paid for the three copies of Interact, apart from fraud.[26]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**24.** It is undisputed that North Carolina law governs the common law claims in this case.

**25.** The charge also covered "programming of the chronoguard, and administrative functions."

**26.** Appellants have not challenged the awards of punitive damages against them, and we do not disturb those awards.