961 F.2d 211
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
LASERCOMB AMERICA, INC., Plaintiff-Appellee,
v.
Larry HOLLIDAY, Defendant-Appellant,
and
JOB REYNOLDS; Holiday Steel Rule Die Corporation, Defendants.
 No. 91-1675.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 4, 1992
Decided: May 6, 1992
 
 Argued: Boris Haskell, Paris & Haskell, Arlington, Virginia, for Appellant.
 Lee Carl Bromberg, Bromberg & Sunstein, Boston, Massachusetts, for Appellee.
 On Brief: Kerry L. Timbers, Bromberg & Sunstein, Boston, Massachusetts, for Appellee.
 Before ERVIN, Chief Judge, and HALL and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 
 1
 This appeal arises from the district court's decision on remand from our opinion in Lasercomb America, Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990) ("Lasercomb I"). In Lasercomb I we instructed the court to recalculate the fraud damages due to Lasercomb America, Inc. (Lasercomb) jointly and severally from Holiday Steel Rule Die Corp. (Holiday Steel), Job Reynolds (Reynolds), and Larry Holliday (Holliday) for fraud involved in copying computer software. Holliday is the only remaining appellant, and he challenges the court's calculation of damages and the court's finding that he is not entitled to damages on an injunction bond. We affirm.
 
 I.
 
 2
 We previously described the facts underlying this appeal in Lasercomb I, 911 F.2d at 971-72, and repeat them only to the extent necessary here. Appellant and defendant below Holliday is president and sole shareholder of Holiday Steel; appellee is Lasercomb, the plaintiff below. As we stated in Lasercomb I:
 
 
 3
 Holiday Steel and Lasercomb were competitors in the manufacture of steel rule dies that are used to cut and score paper and cardboard for folding into boxes and cartons. Lasercomb developed a software program, Interact, which is the object of the dispute between the parties. Using this program, a designer creates a template of a cardboard cutout on a computer screen and the software directs the mechanized creation of the conforming steel rule die.
 
 
 4
 In 1983, before Lasercomb was ready to market its Interact program generally, it licensed four prerelease copies to Holiday Steel, which paid $35,000 for the first copy, $17,500 each for the next two copies, and $2,000 for the fourth copy. Lasercomb informed Holiday Steel that it would charge $2,000 for each additional copy Holiday Steel cared to purchase. Apparently ambitious to create for itself an even better deal, Holiday Steel circumvented the protective devices Lasercomb had provided with the software and made three unauthorized copies of Interact which it used on its computer systems. Perhaps buoyed by its success in copying, Holiday Steel then created a software program called "PDS-1000," which was almost entirely a direct copy of Interact, and marketed it as its own CAD/CAM die-making software. These infringing activities were accomplished by Job Reynolds at the direction of Larry Holliday.
 
 
 5
 Id. at 971.
 
 A.
 
 6
 The district court in its first decision awarded Lasercomb $105,000 in actual damages for copyright infringement and fraud, with Holiday Steel, Holliday, and Reynolds jointly and severally liable, plus $10,000 against Holliday and $5,000 against Reynolds as punitive damages on the fraud claim. Holliday and Reynolds appealed the decision, and on August 16, 1990, we reversed the award of damages due to copyright infringement because Lasercomb's anti-competitive clauses in its standard licensing agreement constituted copyright misuse, a valid defense. Id. at 979. In addition, we vacated the award of fraud damages. We noted that the district court, in its valuation of the three copied Interact systems at $35,000 per copy, evidently considered Lasercomb's loss of sales to persons other than Holiday Steel. We held that the damages could only be properly measured by limiting consideration to lost sales to Holiday Steel. Id. at 981. We remanded for determination of what the cost would have been to Holiday Steel had it not committed fraud. We noted Reynold's and Holliday's argument that the cost would have only been $2,000 per copy, because on August 2, 1983, Lasercomb sent a letter to Holiday Steel stating that the charge for all future software licenses would be $2,000. We pointed out that if Lasercomb offered the reduced price because of Holiday Steel's fraud, $2,000 could not furnish the damages price, and we suggested that Lasercomb's standard discounted price of 25% of the $35,000 price might be the proper measure of damages instead. Id.
 
 
 7
 On remand, the district court found that Lasercomb offered this $2,000 price because of fraud perpetrated by Holiday Steel. Specifically, the court found that prior to August 1983 Holiday Steel complained about nonexistent "bugs" in the system and nonexistent problems relating to the chronoguard system, which was designed to limit application of Interact to one computer so it could not be copied. According to the court:
 
 
 8
 [D]efendants bypassed the chronoguard while representing to plaintiff that the system did not work properly so as to continue to receive updates and technological assistance from plaintiff. Again, plaintiff offered Holiday Steel the additional system for $2,000 as a show of good faith because of defendants' many complaints.
 
 
 9
 J.A. 219-20. The court found fraud by Holiday Steel prior to August 1983 and found that the fraud caused Lasercomb to offer the reduced price.
 
 
 10
 The court then set damages for defendants' fraudulent conduct by applying Lasercomb's standard pricing policy to the three pirated copies of Interact, as well as to the fourth copy that Holiday Steel obtained for $2,000 through fraud. Under the standard policy, all four copies in question would sell for $8,750, and the district court therefore awarded $33,000 in damages to Lasercomb.[1] Holliday alone appeals this ruling.[2] He contends that the damages should be set at $6,000 because the $2,000 price offered was a normal Lasercomb business decision unaffected by Holiday Steel's fraud, which occurred only later.
 
 B.
 
 11
 In addition, Holliday appeals from the district court's denial of his claim for damages on an injunction bond posted by Lasercomb.
 
 
 12
 The district court entered a preliminary injunction against all three defendants on March 24, 1986, prohibiting them from further copying or distributing the Interact software. Lasercomb posted an injunction bond of $75,000. Before the preliminary injunction was entered by the district court, Holiday Steel had sold one copy of its pirated PDS1000 software each to Federal Paper Board Company, Inc. (Federal) and Nabisco Brands, Inc. (Nabisco). Neither Holliday nor Reynolds were personally parties to the sales, from which Holiday Steel received $39,000.[3] One year after the preliminary injunction was entered, on March 26, 1987, the district court entered partial summary judgment against defendants on Lasercomb's claim of copyright infringement. On July 1, 1987, Holiday Steel withdrew PDS-1000 from the market and terminated its agreement with Nabisco. There is no evidence in the record regarding the termination of Holiday Steel's agreement with Federal. Lasercomb subsequently sold two Interact systems to both Federal and Nabisco.
 
 
 13
 One year later, on August 4, 1988, the district court entered judgment against all three defendants, jointly and severally, for breach of contract, copyright infringement and fraud, and entered a permanent injunction against all three defendants, prohibiting them from "publishing, marketing, selling, or otherwise using or disposing" of copies of the infringing software. J.A. 185. On August 23, 1988, Holiday Steel filed for bankruptcy. In December 1988, Holiday Steel filed for approval of a sale of substantially all its assets to a third party. Lasercomb filed the only objection to the proposed plan. On January 9, 1989, Lasercomb and Holiday Steel came to an agreement allowing the sale and barring Holiday Steel from participating in any appeal in this suit. The bankruptcy court approved the agreement.
 
 
 14
 Holliday and Reynolds then appealed the district court's decision against them. On August 16, 1990, we vacated the judgment and injunction entered by the district court against Holliday and Reynolds for copyright infringement on the basis of the copyright misuse defense. Lasercomb I, 911 F.2d at 979. On remand, Holliday and Reynolds argued that they had been damaged by the injunction in excess of $75,000 as a result of their alleged inability to sell additional PDS-1000 systems to Federal and Nabisco. The district court found, however, that the doctrine of unclean hands barred defendants from recovery on the bond. According to the court:
 
 
 15
 As the facts have shown, defendants' hands could not likely be more soiled. Further, the profits defendants claim to have lost would have stemmed directly from their fraud and, as such, are not compensable. Therefore, the bond and the interest that has accrued on it will be awarded to plaintiff.
 
 
 16
 J.A. 221. Holliday appeals this portion of the district court's decision.
 
 II.
 
 17
 The dispositive factual question with regard to Holliday's first argument is why Lasercomb agreed to sell copies of Interact for $2,000 to Holiday Steel. The district court found that Lasercomb only offered this price because of Holiday Steel's fraudulent acts that occurred before August 2, 1983.[4] A district court's findings of fact may not be set aside unless clearly erroneous. Fed. R. Civ. P. 52(a). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." Faulconer v. Commissioner, 748 F.2d 890, 895 (4th Cir. 1984). As the Supreme Court has held:
 
 
 18
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 19
 Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). Greater deference is due to a district court's credibility determinations, due to variations in demeanor and tone of voice that help determine a listener's understanding of and belief in what is said. See id. at 575.
 
 
 20
 For us to uphold the court's determination, we must find sufficient support in the record that (1) Holiday Steel committed fraud before August 1983, by complaining about chronoguards that they had already bypassed or falsely complaining about other"bugs;" and (2) this fraud is what led Lasercomb to reduce its price to $2,000 from its normal discount price of $8,750 for the second and subsequent copies of Interact.
 
 
 21
 First, there is sufficient support in the record about pre-August 1983 fraud by Holiday Steel with respect to the bypassed chronoguards. It is undisputed that Holiday Steel had bypassed the chronoguards by May 1983. It is also undisputed that Holiday Steel employees falsely told Lasercomb that they were having problems with the chronoguards. Holiday Steel did so because the chronoguards were timed to expire at a certain time, after which the systems could not be operated until Lasercomb supplied new chronoguards. As Herbert Shimer, Jr., former Holiday Steel employee, testified, if Holiday Steel did not say that the system was inoperable at this time, Lasercomb would know that the system was not hooked up to the chronoguards, as required. Tr. 403-05. Also, Shimer testified that to his knowledge the Interact system never did become non-functional because of chronoguard problems. Tr. 404-05. These conscious misrepresentations by Holiday Steel employees constituted fraud. See Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391 (N.C. 1988). The question, then, is whether this fraud occurred before August 1983.
 
 
 22
 Kevin Carey, Chief Executive Officer of Lasercomb, testified for Lasercomb as follows:
 
 
 23
 Q:And were you, sir, aware of complaints from the Holiday Company concerning bugs in the Interact system?
 
 
 24
 A:I was aware that in the period of time immediately after they took delivery of the development system they had, there were some bugs; and my understanding was that that had been explained, that there would be some problems as to that. But I was aware that there were some problems.
 
 
 25
 Q:In addition, were there also complaints about the Chronoguard, sir?
 
 
 26
 A:Yes.
 
 
 27
 Tr. 306. It is possible to read Carey's answer to the second question as pertaining to the same time frame to which he referred in his first answer, the "time immediately after [Holiday Steel] took delivery" of Interact, or well before August 1983. On this reading, the district court could easily conclude that Holiday Steel committed fraud before it obtained the $2,000 price. Just because that is not the only reading of Carey's testimony does not compel us to conclude that the district court's interpretation was clearly erroneous, and we decline to overturn the finding.[5] Second, accepting the court's finding that pre-August 1983 Holiday Steel chronoguard fraud occurred, we must then consider whether there is support in the record for the court's finding that Lasercomb offered the $2,000 price as a result of this fraud, and not just because of a normal, market-driven policy. Simon James, President of Lasercomb, testified as to why Lasercomb offered the low price. His testimony can be read as stating that the $2,000 price was offered because Lasercomb thought Holiday Steel was acting in good faith, and an important part of this good faith included believing Holiday Steel's statements that it was using the chronoguards. James answered the following question:
 
 
 28
 Q:And why, sir, was the amount of only $2,000 charged for the software and so forth?
 
 
 29
 A:We felt at the time that Holiday had made a considerable investment in our software, had in fact been working with the previous version of the software, and it was a reasonable commercial thing to do.
 
 
 30
 J.A. 76. Holliday puts undo emphasis on the last phrase, that "it was a reasonable commercial thing to do." James' previous statement, that Holiday Steel "had in fact been working with the previous version of the software," should be read in conjunction with his statements found on the previous transcript page in explaining the 50% discount given to Holiday Steel in July on two Interact systems:
 
 
 31
 It was a-I think a reasonable commercial decision to allow them a discount. From the beginning of our discussions, they discussed the concept of a discount for further systems in addition to that. They had in fact been working with the pre-released software and had been acting in what we believed to be good faith.
 
 
 32
 J.A. 75. This good faith included Lasercomb's reasonable belief that Holiday Steel was still using the chronoguards.
 
 
 33
 In support of this reading, we note the following colloquy when James explained once again why Lasercomb offered the two July 1983 Interact systems at half price:
 
 
 34
 Q:Did the Holiday Company nonetheless continue to represent to you that they were operating the systems with the Chrono-Guard?
 
 
 35
 A:Yes, they did; they continued to ask for new keys. And I think that occurred as late as January of '86 -'85.
 
 
 36
 Q:Mr. James, did you in any sense rely upon these representations of the Holiday Company?
 
 
 37
 A:Yes. We relied throughout the relationship on the good faith and the fact that we were selling additional systems to them. We were talking about entering into some sort of joint marketing agreement.
 
 
 38
 We had every desire to do that.
 
 
 39
 Q:In connection with the pricing, you indicated that the fourth system for $2,000 was a reasonable commercial decision because they had already invested substantially in your software.
 
 
 40
 Did you rely upon their representations to you in extending that very favorable price to them for the fourth system?
 
 
 41
 A:Yes, we did. We believed we had a good relationship to go forward with. They had, as mentioned before, already a substantial investment in our software and they had been working with us in the extinction of the bugs-the bugs present in the program.
 
 
 42
 J.A. 80.
 
 
 43
 We find sufficient evidence to support the court's finding that the pre-August 1983 chronoguard fraud caused Lasercomb to offer the $2,000 price, and we therefore uphold the court's determination of fraud damages.
 
 III.
 
 44
 Holliday also claims that he is entitled to his damages from the copyright infringement preliminary injunction that this court held was erroneously issued. As an initial matter, we have grave doubts that Holliday can prove any damages from the injunction. See Lever Bros. Co. v. International Chemical Workers Union, 554 F.2d 115, 120 (4th Cir. 1976). First, Holiday Steel, not Holliday, owned the programs that Holliday claims the district court erroneously kept off the market, so it would seem difficult for him to claim an ability personally to sell or personally to receive any money from the programs. Second, we question whether Holliday or even Holiday Steel would have any right to proceeds from sale of PDS-1000 since these monies would have been the product of fraud. However, even assuming, without deciding, that these concerns would not prohibit Holliday from receiving the injunction bond proceeds, we find it dispositive that the district court has the equitable discretion to decide to whom the bond should be given.
 
 
 45
 Well before adoption of the Federal Rules of Civil Procedure, the Supreme Court held that a court may refuse to award damages on a restraining order or injunction bond. See Russell v. Farley, 105 U.S. 433 (1882). Courts have continued to retain the power to weigh the equities of the particular case in awarding or denying damages resulting from a preliminary injunction wrongfully obtained.[6] See 7-Pt. 2 Moore's Federal Practice Para. 65.10, at 65-134 (1991 ed.). This court, in Greenwood County v. Duke Power Co., 107 F.2d 484, 489 (4th Cir. 1939), cert. denied, 309 U.S. 667 (1940), cited Farley to just this effect, holding that "the awarding of damages under such a [temporary injunction] bond is not a matter of right, but one resting in the sound discretion of the court." Greenwood was filed two years after the adoption of the Federal Rules and Rule 65(c), thus it is controlling circuit precedent. Accord H & R Block, Inc. v. McCaslin, 541 F.2d 1098, 1099 (5th Cir. 1976), cert. denied, 430 U.S. 946 (1977); Page Communications Eng'rs, Inc. v. Froehlke, 475 F.2d 994, 997 (D.C. Cir. 1973).
 
 
 46
 The district court below certainly did not abuse its discretion in denying Holliday the fruits of his fraudulent conduct. Even though Holliday is correct in pointing out that the fraud claims were separate from the copyright infringement claims upon which the injunction was issued, as a practical matter, and as the district court reasonably found, the two were inextricably tied together. Without fraud, there would have been no copyright infringement claim, and the injunction bond would never have been issued in the first place. Thus the district court could legitimately take Holliday's fraud into account in balancing the equities in deciding to whom it should grant the injunction bond proceeds. We decline Holliday's invitation to overturn this eminently proper exercise of the district court's discretion.
 
 IV.
 
 47
 For the aforementioned reasons, the district court's calculation of $33,000 in fraud damages and its award of all the injunction bond proceeds to Lasercomb are hereby
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 25% of $35,000 is $8,750, times four equals $35,000, less the $2,000 paid for the fourth system equals $33,000
 
 
 [2]
 Holiday Steel, by agreement with Lasercomb, did not participate in the first appeal, and thus continues to be bound by the district court's original judgment. Reynolds settled with Lasercomb after commencement of this appeal, and we granted his notice of withdrawal from the appeal
 
 
 [3]
 After trial, the district court awarded Lasercomb this money against Holiday Steel
 
 
 [4]
 In February 1983, Holiday Steel bought an Interact software system for $35,000 from Lasercomb. In July 1983, Holiday Steel bought two more Interact systems at half price, or $35,000 for both. On August 2, 1983, Lasercomb by letter agreed to set a price of $2,000 for each future system for Holiday Steel
 
 
 [5]
 While we agree with Lasercomb's conclusion that the district court's finding is not clearly erroneous, we do not condone Lasercomb's misrepresentations of the record. For example, none of the three passages to which Lasercomb refers us (J.A. 95, 103-05 and 119-20) demonstrate that Holiday Steel employees lied to Lasercomb in May or June (or even by August) 1983 about not having bypassed the chronoguards, as Lasercomb has claimed. See Appellee Brief at 16
 
 
 [6]
 According to Rule 65(c):
 No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.
 Fed. R. Civ. P. 65(c); see also Fed. R. Civ. P. 65.1.