972 F.2d 341
 1992 Copr.L.Dec. P 26,961
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PRC REALTY SYSTEMS, Incorporated, Plaintiff-Appellee,
v.
NATL ASSOC. OF REALTORS, Defendant-Appellant.
v.
PRC REALTY SYSTEMS, Incorporated, Plaintiff-Appellant,
v.
NATL ASSOC. OF REALTORS, Defendant-Appellee.
 Nos. 91-1125, 91-1143.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 2, 1992
Decided: August 4, 1992
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CA-90-1287-A)
 ARGUED: David Drake Hudgins, Hudgins, Carter & Coleman, Alexandria, Virginia, for Appellant.
 Michael C. Elmer, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for Appellee.
 ON BRIEF: Douglas M. Coleman, Richard D. Carter, Hudgins, Carter & Coleman, Alexandria, Virginia, for Appellant.
 John F. Hornick, Jeffrey A. Berkowitz, Arthur J. Levine, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C.; R. Terrence Ney, McGuire, Woods, Battle & Boothe, McLean, Virginia, for Appellee.
 E.D.Va.
 Affirmed in part and reversed in part.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and RAMSEY, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 I.
 
 1
 Appellant National Association of Realtors, Inc. ("NAR") seeks reversal of an order entered in the United States District Court for the Eastern District of Virginia on May 13, 1991, granting a monetary judgment and injunctive relief in favor of appellee PRC Realty Systems, Inc. ("PRC").
 
 
 2
 PRC filed the original complaint on September 30, 1990, alleging violations including copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., breach of contract, breach of duty of agent to principal, breach of fiduciary duty, intentional interference with existing and prospective business and contractual relationships, and violation of a registered copyright. PRC later filed an amended complaint, alleging additional copyright infringement violations.
 
 
 3
 Trial was held in April of 1991 before the district judge in the absence of a jury, and the court issued a Memorandum Opinion and Order on May 13, 1991, in which PRC was granted relief based on its breach of contract and copyright infringement claims only. The court found that the desk-top publishing software created by NAR violated its existing contractual obligation to promote PRC's publishing business, and exceeded the scope of its license. The new desktop feature, "Book Plus," apparently consisted of approximately 5% of the original software, and was found not to be a permitted enhancement under the software license. NAR filed timely notice of appeal, and PRC responded with a notice of cross-appeal. We conclude that the district court properly held in favor of PRC in regard to its breach of contract claim, but that NAR's misuse of copyright defense serves to bar success of PRC's causes of action for violation of copyright.
 
 II.
 
 4
 Appellee PRC markets a collection of computer software programs which facilitates the work of realty agents. The software was first developed by PRC's predecessor and wholly owned subsidiary MultiList, Inc. ("Multi-List") in the late 1970's. The software, referred to by PRC as the "CASH On Line System" ("CASH"), allows the user to access multiple listing information about available real estate, including information about size and number of bedrooms, location, etc., while facilitating cross referencing of various factors. Users of the CASH system are provided with the capacity to search and extract data combining these factors, e.g., all two-bedroom homes, in a particular area, with access to the waterfront. The original system, however, did not include an on-line publishing feature (similar to the "PRINT" feature on a common word processing program). Accordingly, material accumulated through use of the CASH system could be accessed only on the computer terminal screen of a realtor who had performed the search. Any customer quality publishing had to be performed by an outside party.
 
 
 5
 In 1984, Multi-List,[1] responding to the limitations imposed on its software by the hardware for which it had been developed, sought to develop a version of CASH that could "run" on IBM compatible hardware. Multi-List then looked for a buyer or licensee for the original CASH system, and approached appellant NAR who had begun offering similar listing information services to its customers.
 
 
 6
 On October 31, 1984, NAR and Multi-List entered into a License and Wholesale Agency Agreement whereby NAR obtained a fiveyear exclusive license to use and sublicense the CASH software. NAR was provided with the opportunity to offer its customers a "Book Service Contract," allowing its client or board member to obtain a publication containing multiple listing information from an outside producer. NAR promised to "use those efforts deemed by NAR in its sole discretion to be appropriate and satisfactory to the marketing of Book Service Contracts to those of its customers it deems to be prospective sublicensees of the [CASH system]." The CASH system allowed real estate agents to access multiple listing information, but did not allow for customer quality publishing. The Book Service Contracts provided the means for the accessed information to be converted into multiple listing service books ("MLS books"), bound volumes for the perusal of realty agents and/or prospective buyers, by a publishing service. Multi-List provided MLS publishing services. The district court found that the substantial portion of the profit available in the MLS area directly arose from provision of the publishing service. NAR billed customers for their use of the books, and reimbursed Multi-List for its publishing after deducting a producer's fee. Effectively, NAR promised that it would not market the publishing services of any vendor, other than Multi-List, during the five year period of the license.
 
 
 7
 On January 30, 1985, NAR and Multi-List entered into a second agreement, this one involving updating of the MLS software. The two parties agreed that NAR would modify the CASH system to allow the program to run on more advanced computer hardware, and that NAR would pay Multi-List $187,966 for the right to make the conversion. The new software, referred to as "RCS/MLS" (NAR had also agreed not to use the CASH name) would be marketed by NAR. NAR received the "object code"[2] for the RCS/MLS system in October of 1985.
 
 
 8
 Multi-List failed in its attempt to develop a software compatible with the IBM system. Multi-List was thus without a multiple listing system to market, having licensed out its systems to NAR in the 1984 agreement. Realtron Corporation, another vendor of multiple listing services, sought purchase of Multi-List. NAR, interested in obtaining the unrestricted right to improve on the RCS/MLS system, entered into Realtron's negotiations with Multi-List.
 
 
 9
 On February 28, 1986, Realtron purchased Multi-List, and the new Multi-List entered into a "Termination Agreement" with NAR.[3] Under the new agreement, which terminated the previous agreements between NAR and Multi-List, NAR was granted a non-exclusive license to "use, lease, modify, enhance, adopt and sublicense" the RCS/MLS system. Limitations were placed on the license including a provision preventing NAR from sublicensing the MLS software. NAR was also given the "source code" for the CASH system, and the right to modify and enhance the system, ownership of any such modifications, and an automatically renewable 30 year license.
 
 
 10
 NAR received those benefits for a nominal $1 payment,[4] and the primary consideration offered was its promise to use its best efforts to promote Multi-List's book publishing services. In addition, NAR effectively gave up the exclusive license granted it in the 1984 agreement. That exclusive license, however, had been unilaterally revocable by either party with provision of six months notice pursuant to the 1984 agreement. In addition, the Termination Agreement provided Multi-List with exclusive access to the MLS data accumulated for the Book Service Contracts. The section detailing NAR's "best efforts" responsibilities to promote Multi-List's publishing originally read as follows:
 
 8. Most FAVORED PRODUCER
 
 11
 When a member Board or multiple listing service contracts with NAR for NAR's MLS book, NAR shall first request a quote from Multi-List for the production of these books before requesting a quote from any other producer. In the event the terms offered by Multi-List for the book contract are acceptable to the Board or multiple listing service, and no other vendor offers a lower amount, NAR shall place the book order with Multi-List unless specifically requested by the Board or multiple listing service to place the book with another vendor. NAR shall, however, use its best efforts to convince a Board or multiple listing service to accept the quote and terms offered by Multi-List. Should another vendor offer a lower quote, Multi-List shall have the right to match such lower quote and should Multi-List exercise such right, NAR shall place the book order with Multi-List unless specifically requested [not to]....[5]
 
 
 12
 (Emphasis added). NAR was set to receive four percent of the gross monthly revenue obtained from each book publishing contract.
 
 
 13
 On November 5, 1987, Multi-list was purchased from Realtron by appellee PRC. In August of 1988, in an attempt to reflect the interest of PRC, the parties amended the first sentence of the "Most FAVORED PRODUCER" passage to replace references to Multi-List with references to PRC. As stated above in note 3, the CASH system that Multi-List had developed by this time, now referred to as SPECTRUM, was substantially different than the RCS/MLS system which had been transferred to NAR in the 1984 agreement. As part of PRC's purchase of Multi-List, Multi-List assigned all rights and interest in SPECTRUM to Realtron. But PRC has contended, and Realtron and the district court both have agreed, that PRC retained ownership of the earlier version of the CASH software system separate from SPECTRUM.
 
 
 14
 In March of 1987, NAR began the production of a software desktop publishing system it referred to as "Book Plus." Basically, "Book Plus" was an improvement on the RCS/MLS system which allowed users to publish a camera-ready copy of the multiple listing information "in-house" with the use of new, affordable, and readily available laser printing technology. NAR contends that it had previously considered such an advance and discussed the possible effect of the new system, that of making PRC/Multi-List's publishing service obsolete, but that PRC never expressed an objection or approval.
 
 
 15
 NAR has characterized the development of Book Plus, which it has been currently marketing to its members, as an enhancement or modification of the RCS/MLS system which it originally licensed from Multi-List, and later promoted under the additional restrictions set out in the 1986 Termination Agreement. PRC, on the other hand, has contended that Book Plus is actually an "off-line" version of the "on-line" system which competes with its version of CASH, and with its publishing operation, and that its production and marketing clearly violate the "best efforts" requirements of the Termination Agreement.
 
 
 16
 In addition, on July 27, 1987, NAR granted Offutt Publishing a non-exclusive license to use MLS data to generate books for its clients, and other sublicensees. That grant allegedly violated the terms of NAR's exclusive MLS data transferral relationship with Multi-List (and subsequently PRC) set out in Appendix D of the Termination Agreement.6 On November 30, 1988, NAR promised to use its best efforts to promote the publishing services of another publisher, Realtron, in apparent violation of its agreement to use its best efforts to promote PRC's publishing services. NAR has contended that Realtron and PRC had made it a joint offer to expand the most favored producer relationship with Multi-List to include both Realtron and PRC, and that NAR was relying on that offer when it made its best efforts promise to Realtron.
 
 
 17
 PRC has subsequently filed Certificates of Copyright Registration for its "CASH" software. On June 28, 1990, a registration was filed under the heading "CASH CATALOG INTERFACE PROGRAM", and later on December 20, 1990, another registration was filed under the heading "CASH ON-LINE SYSTEM."
 
 
 18
 PRC's original complaint alleged six separate offenses on the part of NAR: 1) breach of contract relating to the"best efforts" obligation set out in Paragraph 8(a) of the Termination Agreement, the granting of a non-exclusive right to Offutt Publishing to use the MLS data after apparently having granted Multi-List the exclusive right to do so, and the copying of the code from the Multi-List programs to use in the creation of Book Plus; 2) anticipatory breach of contract regarding the same matters; 3) copyright infringement concerning alleged violation of copyrights registered by PRC pursuant to 17 U.S.C. § 410; 4) breach of duty of agent to principal, alleging that NAR was a "wholesale agent" of PRC when it undercut its business; 5) breach of fiduciary duty regarding a similar alleged relationship; and 6) intentional interference with existing and prospective business and contractual relationships, concerning NAR's entry into competition with PRC.
 
 
 19
 The district court found that the wholesale agent relationship between NAR and PRC had ended at the time of the 1986 Termination Agreement, preventing the breach of fiduciary duty and breach of duty of an agent claims. The court also dismissed the final count, ruling that NAR was motivated by its own competitive interests, not with an interest in interfering with PRC, and that any damages arising out of an intentional interference violation would duplicate those damages available for the breach of contract claim. As to all other counts, the district court found in favor of PRC. The court addressed PRC's figure of $13,873,800 for lost profits, and determined that certain particulars in forming the figure were speculative. Additionally, PRC sought damages in the amount of $2,190,686 for profits NAR realized for the sale of Book Plus. The court held that any such allowance, provided in addition to damages incurred for PRC's lost profits, would constitute double recovery. Accordingly, judgment was entered in favor of appellee PRC against appellant NAR in the amount of $5,658,753 plus costs.
 
 
 20
 In addition, the court dissolved the 1986 Termination Agreement, and provided injunctive relief which prevents any officers or agents of NAR from granting any further licenses arising from, or to use in any way, products of the CASH system, including the Book Plus software. NAR was allowed to maintain all licenses affecting the software in existence at the time of the order, but it was not allowed to transfer or sublicense any of them.
 
 III.
 
 21
 In its appeal, NAR has sought reversal of the district court's order and damage award. Specifically, it has sought review of the court's conclusions that NAR breached its contractual obligations to PRC by producing and dispensing its Book Plus service, and by making nonexclusive license arrangements with parties other than PRC; and that NAR violated copyrights registered to PRC. PRC has brought a crossappeal claiming that the district court failed to award sufficient damages.
 
 
 22
 The opinion of the district court includes conclusions of law and findings of fact. We must review the conclusions of fact on the clearly erroneous standard, and the conclusions of law on the de novo standard. "The question of which standard of review applies to contract matters is not always so clearcut because the interpretation of a contract and the determination as to its breach are a mixed question of fact and law ... In general, factual findings as to what the parties said or did are reviewed under the 'clearly erroneous' standard while principles of contract interpretation applied to the facts are reviewed de novo." L.K. Comstock & Co. v. United Eng. & Constructors, 880 F.2d 219, 221 (9th Cir. 1989) (citation omitted).
 
 IV.
 
 23
 A.Consideration Provided for and the Nature of the Agreement Between NAR and PRC
 
 
 24
 The factual findings of the district court relating to NAR's breach of contract must be reviewed under the clearly erroneous standard, and, provided that there is support for the conclusions in the record, accepted. The district court found, supported by evidence in the record, that appellant NAR marketed and sold its"Book Plus" software, and that its actions served to undermine PRC's publishing interests. PRC, before the advent of the Book Plus system, stood to receive contracts for the publishing of most, if not all, information produced by the MLS systems provided by NAR. With the advent of Book Plus, NAR's officers and agents were not required to pass the publishing work on to PRC, or some other outside publisher, to create a customer-quality product. NAR, and its agents, were able to use the Book-Plus system to produce their own "in-house" product.
 
 
 25
 The question presented on appeal is whether that"harm" to PRC created by NAR's development of Book Plus constituted a breach of its contractual obligation to use its "best efforts" to induce its customers to use the publication services provided by PRC. We conclude that it did.
 
 
 26
 The 1986 Termination Agreement provides for two specific contractual duties that were violated as a consequence of NAR's development and marketing of Book Plus. First, the contract mandated that NAR, in response to a request by a customer for the production of an MLS book, had to contact PRC to request a quote on the price for publication first before contacting another producer. With Book Plus, NAR, and its employees and agents, were able to publish the MLS book, or its substantial equivalent, without seeking the assistance of any outside publisher, including PRC. The restriction on publication of MLS material, without first seeking a quote from PRC, applied equally under the contract to the situation in which NAR was the "other producer" as it did to a circumstance in which NAR had farmed out the publishing job to a third party. PRC was the sole beneficiary of the protection set out in the relevant contractual provision. The central feature of the provision, and of the benefit offered to PRC by NAR, was the support and expansion of PRC's publishing business. NAR's use of any publishing service, including its own, without first seeking a quote from PRC for its publishing services, clearly has breached its contractual obligation.
 
 
 27
 The second express duty violated by NAR's actions is more vague, but consequently, more far-reaching. The Termination Agreement stated that: "NAR shall, however, use its best efforts to convince [its customers] to accept the [publishing] quote and terms offered by Multi-List." Standing on its own, the obligation appears a bit harsh, particularly in the situation at hand, in which PRC and NAR stand as potential competitors for much of the same real estate business. But any apparently undue severity is illusory given the specifics of the contractual obligation between the parties. The district court has found that PRC provided NAR with the source code for its "CASH" software, and a thirty-year renewable license for the system, for only nominal ($1.00) monetary consideration.
 
 
 28
 One central issue on appeal concerns exactly what additional consideration was offered by NAR to close the bargain with PRC. NAR has disputed the findings concerning the extent of the consideration offered. It has argued that the benefit received by PRC was the termination of its exclusive license with NAR, and that NAR only agreed to the release of the exclusive arrangement because it was offered the opportunity to elicit the publishing services of other producers within the constraints of the "Most FAVORED PRODUCER" provision of the Termination Agreement. But the record indicates that the previous 1984 agreement allowed for either party unilaterally to terminate the exclusive arrangement without cause with only six months notice. It is most unlikely that PRC would have intended to provide significant services and benefits in exchange only for NAR's agreement to terminate its exclusive relationship when PRC already was able to sever that relationship itself without any additional performance or payment on its part.
 
 
 29
 The district court properly concluded that actual benefit bargained for and to be received by PRC was the solicitation of publishing business for PRC that NAR was obliged by the agreement to endeavor to secure. At the time of the agreement, prior to the development of Book Plus, NAR necessarily was obliged to seek outside help in producing printed MLS material. To the extent that NAR was successful in using the "CASH" software to promote its own business interest, the agreement set up a situation which effectively ensured that most, if not all, of the publication that arose out of NAR's successful solicitation would pass through PRC's doors. It was, at the time, a mutually beneficial arrangement between the parties.
 
 
 30
 NAR was provided with free access to the powerful software, improving its efficiency, and adding additional revenue for its role in the production of MLS information. PRC was provided with a broad base marketing scheme for its publication service, with a veritable guarantee that a significant percentage of the fruits of its software production would return to support its profit.
 
 
 31
 NAR's development of Book Plus undermined the primary basis of the consideration for the contract between the parties. To the extent that NAR has published its own MLS books, effectively freezing PRC out of the benefits arising from the CASH software, NAR has received the continuing and substantially lucrative benefit of PRC's software for the nominal sum of $1.00. NAR has argued that the Termination Agreement altered the agency relationship between the parties and, thereby, relieved it of its primary responsibility to solicit business for PRC. The relevant language of the Termination Agreement, however, dictated that NAR remained obligated as a first order of business, in marketing MLS systems, to promote PRC's publishing business. Given the specifics of the consideration provided in the agreement, the district court correctly determined that the development of the Book Plus system violated the "best efforts" provision of the contract.
 
 B.The "Best Efforts" Obligation
 
 32
 i.Effect of the Obligation
 
 
 33
 Pursuant to a stipulation by both parties in the 1986 Termination Agreement, any questions relating to interpretation of the meaning of the contract must be analyzed using Colorado law. In United Telecomm. v. American Tel. & Comm. Corp., 536 F.2d 1310 (10th Cir. 1976), the Tenth Circuit, applying Colorado law, expressed its view of the effect of a "best efforts" promise on the requirement of action that would be expected of the promisor. The court, citing language from a proposed jury instruction on the issue, found that "little difference" could be perceived between the state of the law and the expression of it offered by one of the parties:
 
 
 34
 A "best efforts" obligation does not require[the promisor] to accomplish a given objective ... it requires [the promisor] to make a diligent, reasonable, and good faith effort to accomplish that objective. The obligation takes into account unanticipated events and the exigencies of continuing business and does not require such events or exigencies be overcome at all costs. It requires only that ... all reasonable efforts within a reasonable time to overcome any hurdles and accomplish the objective [be made].
 
 
 35
 Id. at 1319 n. 7.
 
 
 36
 Accordingly, following that definition, we accept the district court's conclusion that the production and promotion of the Book Plus system, and other actions on the part of NAR, were inconsistent with the best efforts obligation made by NAR in that the actions did not constitute a diligent, reasonable, and good faith effort to accomplish the goal of promoting PRC's publication business. The production of Book Plus actually constituted a direct effort to undermine the goal for which NAR had agreed to offer its support. NAR's promise to provide best efforts to another, competing party to promote its publication business constituted a clear violation of its obligation under any reasonable definition of the word "best" in its undertaking to PRC.
 
 
 37
 ii.Book Plus
 
 
 38
 NAR has cited language in the agreement which supports its claim that it had exclusive rights to enhance and alter the CASH software, and to benefit from the fruits of that labor, in the form of sole ownership of those enhanced systems. NAR's claim to the right to enhance the software is not sufficient to cover all aspects of the harmful effect of its publishing activities, and the breach they involve. One certainty in analyzing the agreement, in relation to the perceived potential fruits of NAR's labor, is that both parties, at the time the agreement was made, failed to contemplate that one of the fruits would be NAR's wholesale publishing of MLS material, particularly, at the expense of PRC. The cited language supports NAR's claim that it could alter the software as it pleased, but not its claim that it violated no covenant by cutting severely into PRC's publishing business that it had promised to use its "best efforts" to support. NAR has asked us to rule that the "best efforts" language in the agreement had no special meaning, and effectively, no meaning at all. This we are unwilling to do.
 
 
 39
 The exact effect of the "best efforts" obligation in the present case, or any case, is certainly open to dispute, absent precise formulation of details of every exact sub-duty made binding by the general wording of the contract. But the activities of NAR in regard to its best efforts obligation to PRC provide a factual scenario that forestalls legitimate concern that the situation is one in which an ambiguous contractual provision is being enforced to the detriment of a blameless party. Certain possible actions on the part of NAR could have created a substantial issue of what kind of performance constituted "best efforts" (e.g., less than zealous solicitation on PRC's behalf or a vague relationship with other publishers that might have had a collateral negative effect on PRC). NAR's creation and use of Book Plus, however, clearly and substantially directly harmed PRC's publishing interest. The harm caused by NAR's activities indicated that NAR failed to approach and meet the duty of providing diligent, reasonable and good faith efforts to support PRC. Accordingly, we have concluded that the development of Book Plus constituted a breach of its PRC contract by NAR.
 
 
 40
 iii.Additional "Best Efforts" Promise
 
 
 41
 We must now analyze NAR activities, other than the production of Book Plus, to determine whether those actions additionally constituted a breach of its duty to use its best efforts to promote PRC's publishing services. In addition to the development of Book Plus, NAR entered into agreements with two third party companies, which apparently severely undermined not only its "best efforts" promise, but also other obligations to PRC.
 
 
 42
 NAR included all but identical "best efforts" language present in its contract with PRC in its agreement with Realtron, dated November 30, 1988. The district court's finding that such a duplication of a promise to promote publishing services clearly breached NAR's covenant with PRC was not clearly erroneous, or even erroneous at all.
 
 
 43
 NAR has argued that it was responding to an open offer from PRC in conjunction with Realtron to expand its MLS publishing relationships. On November 6, 1987, the day following PRC's purchase of Multi-List from Realtron, a letter was posted to NAR proposing to expand its MLS relationship to include both PRC and Realtron. The offer was specifically left "open ... for discussion at your pleasure" to NAR. NAR has contended that it was acting in reliance on the "joint Realtron/PRC offer" when it entered into the best efforts obligation with Realtron in December of 1988.
 
 
 44
 NAR cannot support its justification with the evidence on the record, however. On June 10, 1988, NAR received a proposed agreement, along with a letter from PRC which explicitly informed NAR that Realtron was no longer a party to the agreement. The letter, posted more than five months before NAR's subsequent agreement with Realtron, constituted both notice of the change in circumstances, and a revocation of the "joint" offer. NAR or PRC had performed no activity, and NAR had offered no consideration in the period between the November 6, 1987 letter suggesting a joint agreement, and the June 10, 1988 letter revoking that offer, to suggest that PRC's revocation of the original offer was improper. "An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract." Restatement (Second) of Contracts § 42 (1981).
 
 
 45
 Any potential ambiguity concerning the extent of the best efforts obligation is not at issue given the facts of the present case. It is clear that no party can provide "best efforts" to promote the business of two separate and competing parties. The mere act of promising to promote best efforts to Realtron after making the same promise to PRC violated the terms of NAR's agreement with PRC. A party might be capable of providing "darn good" efforts to more than one party, but any reasonable definition of the term "best" indicates that only one party may be the beneficiary of any individual's"best" efforts at least in the competing circumstances here demonstrated.
 
 
 46
 iv.Subcontracting of MLS Data
 
 
 47
 The other suspect agreements made by NAR with third parties involved a subcontracting obligation made to Realtron, and Offutt Publishing. Specifically, NAR provided both Offutt and Realtron with the "right to use MLS data for the purposes of generating the MLS Book." In its agreement with PRC, at Appendix D, Paragraph 3, NAR promised that "Multi-List[7] shall have the exclusive right to use MLS data for the purposes of generating the MLS Book as provided for in this Agreement and the Book Service Contract ... " The original agreement did not mandate that NAR use PRC publishing, only that it make significant efforts to induce its customers to use PRC. Paragraph 8 of the agreement specifically allowed NAR's customers to request a Book Service Contract with another vendor. The Appendix language cited by PRC, however, was a subsequent restriction on the rights of NAR to allow others to use the MLS data. The district court interpreted it as such when it ruled that following the agreement indicated by the Appendix, NAR had "nothing left ... to grant to Offutt and Realtron."
 
 
 48
 NAR has suggested a plausible alternative meaning which could be applied to the "exclusive right" to use the MLS data set out in Appendix D. It has contended that the exclusivity provision only became effective in concurrence with the Book Services Contracts that PRC actually obtained. The language of Appendix D does suggest that application of the exclusivity provision only kicked in when a Book Source Contract had been secured by PRC. The language of the contract is ambiguous as to the effect of NAR's sublicensing agreement with Offutt and Realtron on PRC's interests. The district court concluded, however, that NAR violated the provisions of Appendix D by entering into the agreement with the other parties. There is simply insufficient evidence to support a conclusion that the district court was clearly erroneous when it made its determination that the Appendix D language effectively had barred NAR from releasing MLS data to other parties, and, consequently, that a breach occurred when NAR entered into the subcontracting relationships with Offutt and Realtron. Accordingly, we are obliged to affirm that aspect of the district court order. Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984) (holding that the clearly erroneous standard applies when the district court offers a conclusion as to the intent of parties indicated by ambiguous contractual language).
 
 V.
 The Scope of the License
 
 49
 The district court also found in favor of PRC regarding its claims of violation of the license granted to NAR in the 1986 Termination Agreement. The initial focus of dispute concerning the issue of the license violation is the question of whether NAR"copied" PRC's software to produce Book Plus. NAR admits that it made use of various programs provided by the "CASH" system software, but contends that it did not actually copy the program in its entirety. PRC cites evidence of experts, including NAR's own witnesses, that the "CASH" system and other PRC systems were copied by NAR. The district court's determination that the software was copied is one primarily of fact, and not of legal interpretation. Accordingly, the testimony indicating that the Book Plus system was developed by copying the systems provided to NAR by PRC was sufficient to support the district court's ruling under the clearly erroneous standard.
 
 
 50
 A central issue on appeal concerns the interpretations of the licensing agreement between parties, and the question of whether NAR's development of Book Plus was proscribed by the licensing agreement. In Paragraph 2 of the 1986 Termination Agreement, NAR was granted: "a non-exclusive, non-transferable license to use, lease modify, enhance, adapt and sublicense the software ... subject to the limitations set forth ... " The limitations included a complete restriction on the sublicensing of the fruits of the software to competitors of PRC, on the use of the "CASH" name, and on the release of the "source code."
 
 
 51
 The district court held that though the term "enhance" was ambiguous in Paragraph 2, the development of Book Plus constituted a "separate product," distinct enough, in form and function, to fall outside the range of allowed for modifications in the software. The court made much of the distinction between an "on-line" service and an "off-line" service. Prior to the development of Book Plus, NAR had solely on-line capability. Book Plus allowed NAR to take the information "off-line," or off the terminal screen, and publish a marketable written product. The district court held that the Book Plus modification was significant, and that it violated the provisions of Paragraph 8 of the Termination Agreement cited previously, because NAR was, for the first time, undercutting the publishing business of PRC that it had promised to promote.
 
 
 52
 Here, as before, precise analysis of the beliefs of the parties as to the future use of the disputed software informs the proper resolution of the issue. Neither party apparently foresaw that the "CASH" software might ultimately produce a competitor for PRC's publishing services. The language of Paragraph 2 of the Termination Agreement provides significant leeway for NAR in altering the software, but the body of the agreement, specifically the language of Paragraph 8, and the intent expressed, indicate that enhancement of the MLS system, as perceived by the parties, did not include a wholesale addition to the system to allow for the critical capacity to publish MLS material without enlisting the assistance of a publishing service. The apparent primary reason for PRC's initial transfer of the software to NAR was its hope that such transfer would raise the number of orders for its publishing operation. A "modification" or"enhancement" of the software that would make those services all but obsolete stands outside the reasonable sphere of licensing opportunities provided to NAR.
 
 
 53
 Book Plus is not an enhancement or modification of the original "CASH" software; it is a significantly new system incorporating most of the features of "CASH" that allows for in-house publishing by employees of NAR. In the context of some imaginable agreements, the addition of publishing capability to a software service might not be important, but, within the present circumstances, that addition is centrally important. The change in the function of the software is the key, particularly to PRC's business interests. Though NAR has claimed that the Book Plus system is not a new and separate system, it indisputably has performed a new and separate function, one that was not only uncomprehended by the parties when the modification provisions of Paragraph 2 were promulgated, but one that serves to undermine the basis of the entire agreement, and specifically violates the "best efforts" provision in Paragraph 8. Accordingly, the district court's ruling that NAR exceeded the scope of its licensing relationship with PRC, and thereby breached its contractual obligation, should be affirmed.
 
 VI.
 Misuse of Copyright
 
 54
 Issues concerning the ownership of the CASH software are raised on appeal. We need not reach the merits of the dispute, however, given our acceptance of the validity of NAR's misuse of copyright defense.
 
 
 55
 NAR has repeated on appeal its assertion made at trial that PRC's copyright infringement claims were in furtherance of a predatory scheme to eliminate its competition in the MLS book publishing field. Our review of the claim is de novo, as an issue of law, even though the district court failed to address the misuse of copyright issue. If successful, NAR's asserted defense would prevent PRC from prevailing on its infringement claim.
 
 
 56
 NAR has relied on our opinion in Lasercomb American, Inc. v. Reynolds, 911 F.2d 970 (4th Cir. 1990), to support its claim of misuse of copyright. In Lasercomb, we surveyed the development of a misuse of copyright defense by detailing the history of the misuse of patent defense, which is closely related to the misuse of copyright defense, and determined that the misuse of patent defense lies in the circumstances of a culpable plaintiff in a patent infringement action who has used the patent in question unduly to restrain competition (e.g., "price fixing, tie-ins, territorial restrictions, and so forth." Id. at 976). Basically, the defense is available when the plaintiff has used its patent to "restrain competition in the sale of an item which was not within the scope of the patent's privilege."[8] Id. 975.
 
 
 57
 We concluded that the misuse of copyright defense is analogous to the misuse of patent defense, and applied the misuse of copyright defense to the facts of Lasercomb because the plaintiff in that case had incorporated "anti-competitive clauses in their licensing agreement" governing the use of copyrighted material. Id. at 977. Specifically, the agreement forbade the licensee from developing or assisting in developing any software that resembled plaintiff's copyrighted innovation (the "Interact" system). We held that the plaintiff "undoubtedly has the right to protect against copying of [its material, but that its] standard licensing agreement ... goes much further and essentially attempts to suppress any attempt by the licensee to independently implement the idea which Interact expresses." Id. at 978.
 
 
 58
 It appears that PRC has sought an even more restrictive, and anticompetitive result in the present case. PRC's "best efforts" requirement from NAR would effectively preclude production of any system which would serve to undermine PRC's publishing business. Such a provision would not only prevent the incorporation of the Book Plus system into on-line publishing software, but would disallow the development of any on-line publishing systems by NAR, solely because of its license to use and enhance Book Plus. The combination of the original "best efforts" obligation not involving copyrighted material, with the subsequent 1990 copyright filings, served to violate the public policy embodied in the grant of a copyright, Lasercomb, 911 F.2d at 973-75, by serving to suppress any independent expression of the idea at issue here, namely, the development of the useful and efficient on-line publishing feature, so long as the development would serve substantially to harm PRC's publishing interests. Lasercomb, 911 F.2d at 978-79. In the present case, PRC would have every right to ensure that its Book Plus software was not exploited without compensation for the use, but PRC is not allowed in addition to use its copyright as a hammer to crush all future development of an independent idea by NAR, or any other licensee. Accordingly, NAR has properly asserted the misuse of copyright defense, under the Lasercomb standard.
 
 
 59
 Application of the defense in NAR's favor does not serve to mandate reversal of the district court's ruling in PRC's favor regarding NAR's breach of contract, however. Though the licensing agreement embodied in the Termination Agreement became a copyright licensing agreement because of the later copyright filing, at the time of the breach occasioned by the development of Book Plus and the other activities of NAR, all occurring prior to the two 1990 copyright filings, the original agreement between parties did not concern copyrighted material. PRC's late copyright filing was unsuccessful in allowing for an award for copyright infringement, but the latter characterization of the case as one involving copyrighted material does not serve retroactively to excuse NAR's earlier breach of contract. Given our conclusion as to the validity of the misuse of copyright defense, the case should be remanded to recalculate proper damages, which should not include any monetary or injunctive relief for copyright violation.
 
 Conclusion
 
 60
 The opinion of the district court regarding the breach of contract is affirmed. The licensing agreement between parties, however, which now controls interests and obligations concerning copyrighted material, following PRC's copyright filing, is invalid as an instance of misuse of copyright. Accordingly, though the aspects of the district court's opinion allowing for damages for breach of contract are affirmed, any order allowing for an award for violation of copyright, or continued enforcement of the licensing agreement through injunction, must be reversed. The case is thus remanded to the district court for re-evaluation of damages, and a reconsideration of the issue of injunctive relief consistent with this opinion.[9]
 
 AFFIRMED IN PART AND REVERSED
 AND REMANDED IN PART
 
 
 [1]
 At the time of the development of CASH, Multi-List was owned by McGraw-Hill Corporation. In 1984 it was purchased by REDI Corporation
 
 
 [2]
 The object code for the system, which is the set of instructions that the computer actually executes, is to be distinguished from the "source code" which is a series of instructions actually written by human computer programmers
 
 
 [3]
 Following the purchase, Multi-List began developing an enhancement of the CASH software system called SPECTRUM. By November of 1987, the SPECTRUM on-line system was substantially different from the original CASH system
 
 
 [4]
 An additional $13,550 was paid by NAR to Multi-List for satisfaction and release of past and pending claims between the parties
 
 
 [5]
 The Boards and multiple listing services mentioned in the section refer to NAR's customers who could, as indicated by the provision, place book production orders with services other than Multi-List
 
 
 [6]
 Appendix D, in pertinent part, read as follows:
 As related to the procuring and delivery of the initial MLS Book under any Book Service Contract or renewal thereof, NAR shall perform the following:
 ... NAR shall cause each entity taking a Book Service Contract to provide data to be used in the production of MLS Books which conform to the media and data layout specifications as provided by Multi-List. Multi-List shall have the exclusive right to use MLS data for purposes of generating the MLS Book as provided for in this agreement and the Book Service contract, but all rights, title and sublicensee providing such data and Multi-List shall not disclose, retain, compare, manipulate or otherwise use in any other way such MLS data.
 
 
 [7]
 Subsequently PRC
 
 
 [8]
 For example, in the case cited as the first Supreme Court expression of misuse of a patent, a salt company sought to use its patent for a salt depositing machine to force companies to use the salt tablets it produced. Morton Salt Co. v. G.S. Suppiger, 314 U.S. 488, 490-92 (1942)
 
 
 [9]
 The parties contested the validity of the process through which the district court arrived at a damage award for the copyright violation. But, given the success of NAR's misuse of copyright defense, the propriety of the court's calculation of damages for copyright violation is no longer an issue