Triage Logic Mgmt. & Consulting, LLC v. Innovative Triage Servs., LLC, 2020 NCBC 57.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 399

TRIAGE LOGIC MANAGEMENT
AND CONSULTING, LLC,

Plaintiff,

v.

INNOVATIVE TRIAGE SERVICES,
LLC,

Defendant.

ORDER AND OPINION ON MOTION
TO DISMISS PURSUANT TO RULE
12(b)(6)

1.     **THE MATTER** is before the Court on the Motion to Dismiss Pursuant to Rule 12(b)(6) (the "Motion") filed by Defendant Innovative Triage Services, RNs On-Call LLC (formerly Innovative Triage Services, LLC) ("Defendant" or "ITS") on March 17, 2020.  (ECF No. 13.)  The Motion seeks to dismiss all claims asserted by Plaintiff Triage Logic Management and Consulting, LLC ("Plaintiff" or "TLMC") for failure to state a claim pursuant to Rule 12(b)(6).  For the reasons stated below, the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Clint S. Morse, for Plaintiff Triage Logic Management and Consulting, LLP*

*Enns & Archer LLP, by Rodrick John Enns, and Mackenzie Hughes LLP, by Dean J. DiPilato, for Defendant Innovative Triage Services, RNs On-Call LLC*

Robinson, Judge.

## I.     INTRODUCTION

2.     This case arises out of a licensing agreement between Plaintiff, a medical software provider, and Defendant, one of its former customers.  Plaintiff specializes

in providing a software platform for triage nurses. It entered into a licensing agreement with Defendant for the use of Plaintiff's software. Defendant used Plaintiff's software for approximately eight years before the licensing agreement was terminated. During the term of the licensing agreement, Defendant allegedly disclosed Plaintiff's software to a third-party who in turn made a competing product similar to Plaintiff's product. Plaintiff brings claims for breach of contract and common law unfair competition stemming from Defendant's alleged improper use of Plaintiff's software. Defendant has moved to dismiss both claims for failure to state a claim.

## II. PROCEDURAL AND FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion to dismiss pursuant to Rule 12(b)(6) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.

4. Plaintiff initiated this action by filing the Complaint on January 21, 2020. (ECF No. 3.) Thereafter, the action was designated as a mandatory complex business case, (ECF No. 1), and assigned to the undersigned on February 28, 2020, (ECF No. 2).

5. Plaintiff is a Delaware limited liability company with its present place of business in Florida. (Compl. ¶ 1.) Prior to its relocation to Florida, Plaintiff's place of business was located in Forsyth County, North Carolina. (Compl. ¶ 3.) Defendant is a New York limited liability company with its principal place of business in Missouri. (Compl. ¶ 2.)

6. In or about 2006, Dr. Charu Raheja, PhD and Dr. Ravi Raheja, MD co-founded TLMC. (Compl ¶ 1.) TLMC was created in order to provide a software platform used to ensure that triage nurses would be available throughout the day for people that needed diagnosis and treatment in hospitals and other medical practices. (Compl. ¶ 1).

7. TLMC software differs from the versions of triage contact technology that were widely popular prior to Plaintiff's development and commercialization of its software. (Compl. ¶ 11). Its software provides contracting medical practices with a telephone number unique to each medical practice that connects patients to a triage nurse. (Compl. ¶ 10). Rather than forcing nurses to look through multiple binders of practice information for each call, (Compl. ¶ 11), nurses utilizing TLMC software have access to information specifically added to the TLMC database by the relevant medical practice, making the job of a triage nurse more efficient, (Compl. ¶ 12).

8. TLMC software creates an easy-to-read single screen for nurses which contains all relevant information needed to render services to a particular patient by a triage nurse, (Compl. ¶ 14), which is referred to by TLMC as the "Easy Read Screen[,]" (Compl. ¶ 15).

9. The features of TLMC software have given it a unique commercial advantage when compared to traditional telephonic nurse triage networks. (Compl. ¶¶ 17–18.)

10. On or about June 20, 2011, Plaintiff entered into a System License Agreement (the "Licensing Agreement") with Defendant. (Compl. ¶ 20.) The

Licensing Agreement included a choice of forum clause setting Forsyth County, North Carolina as the agreed-upon forum to resolve any disputes arising therefrom. (Compl. ¶ 4.)

11. Of importance to Plaintiff's claims for relief, Section 3.b. of the Licensing Agreement contains the following restrictive covenants (the "Restrictive Covenants"):

> 3. Limitations to License; Equipment
>
> a. Ownership Rights. Except for the limited license granted to Licensee in Section 1 above, TLMC retains exclusive ownership and all right, title and interest in and to the System.
>
> b. Restrictions. Except as expressly permitted by this Agreement, the Licensee shall not: i) grant sub licenses to sell, assign, give or otherwise transfer the System or its rights thereto, in whole or in part; ii) modify, disassemble, decompile, reverse engineer, or otherwise re-create the System, in whole or in part; iii) copy or otherwise reproduce the System, in whole or in part; iv) disclose, divulge, or otherwise make available the System, in whole or in part, to any third party; v) develop similar software, services or product offerings substantially similar to the System; or vi) disclose to any third party the payment terms agreed to by TLMC and Licensee under this Agreement.

(Compl. ¶ 18.)

12. The Restrictive Covenants "survive the end of the license term" pursuant to Section 7.c of the Licensing Agreement. (Compl. ¶¶ 19, 22.)

13. Plaintiff alleges that it performed all of its obligations under the Licensing Agreement. (Compl. ¶ 23.) Sometime during the Spring of 2019, Plaintiff and Defendant terminated their relationship and the Licensing Agreement. (Compl. ¶ 24.)

14. Prior to the termination of the Licensing Agreement, Defendant contracted with a software development company named PQC Tech to create software similar to that provided by Plaintiff. (Compl. ¶ 25.) Defendant allegedly provided PQC Tech access to Plaintiff's software packages. (Compl. ¶ 28.) In so doing, Plaintiff alleges that Defendant recreated Plaintiff's software packages, in whole or in part, and developed "software substantially similar to TLMC's software packages." (Compl. ¶ 29.)

15. After being provided access to Plaintiff's software, PQC Tech created software, called "On-Call Hub", with similar features to the TLMC Easy Read Screen. (Compl. ¶¶ 26, 27.) PQC Tech released its On-Call Hub in 2019. (Compl. ¶ 26.) Plaintiff does not allege what, if any, ownership interest or rights Defendant had in On-Call Hub.

16. As a result of Defendant's conduct, Plaintiff initiated this lawsuit. (ECF No. 3.) Defendant moved to dismiss all Plaintiff's claims by filing the Motion on April 17, 2020. (ECF No. 13 ["Br. in Supp."].) Thereafter, Plaintiff filed a response in opposition to the Motion on May 29, 2020. (ECF No. 15.) On June 8, 2020, Defendant filed a reply. (ECF No. 19 ["Reply"].) On July 15, 2020, the Court held a hearing on the Motion, at which both parties were represented by counsel. The Motion is ripe for determination.

### III.  LEGAL STANDARD

17.  In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (citation omitted).  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  The Court accepts all well-pleaded factual allegations in the relevant pleading as true.  *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018).  The Court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

18.  Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 821 S.E.2d 729, 736–37 (N.C. 2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).  This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 737 n.7 (citations omitted).

## IV.    ANALYSIS

19.    The Motion seeks dismissal of both Plaintiff's claims for (i) breach of contract; and (ii) common law unfair competition.  The Court addresses each in turn.

### A.    **Breach of Contract**

20.    Plaintiff's breach of contract claim is predicated upon the Restrictive Covenants contained in Section 3.b. of the Licensing Agreement between Plaintiff and Defendant.  (Compl. ¶¶ 18–19.)  Defendant contends that the Restrictive Covenants are naked restraints on trade and should be invalidated as a matter of public policy based on existing North Carolina non-compete law in the employment and/or sale-of-business context.  (Br. in Supp. 4–5.)

21.    In determining whether the allegations of a complaint are sufficient to state a breach of contract claim upon which relief may be granted, Plaintiff must allege "(1) the existence of a valid contract and (2) breach of the terms of that contract."  *Poor v. Hill,* 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (quoting *Jackson v. California Hardwood Co.,* 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)).  Here, the parties do not dispute that there is an agreement—the Licensing Agreement—that governs this dispute at large.  Accordingly, the Court focuses on whether Plaintiff has sufficiently alleged breach of the Licensing Agreement for purposes of 12(b)(6), which requires a specific analysis of Section 3.b. and the alleged breaches complained thereof.

22.    Though defined in the Complaint as "Protective Covenants[,]" Plaintiff does not clarify whether it interprets each sub-section of Section 3.b. to be standalone

covenants. Defendant argues that Section 3.b. should be read as a single covenant. Construction of a contract is ordinarily a matter of law for the Court. *Southpark Mall Ltd. P'ship v. CLT Food Mgmt.*, 142 N.C. App. 675, 679, 544 S.E.2d 14, 17 (2001). Accordingly, the Court first determines whether, pursuant to common canons of contract construction, Section 3.b. contains uniquely distinct and severable provisions, such that if any one sub-section of Section 3.b. constituted an enforceable covenant that Defendant allegedly breached, Plaintiff's claim for breach of contract would go forward. Section 3.b. reads, in total:

> b. Restrictions. Except as expressly permitted by this Agreement, the Licensee shall not: i) grant sub licenses to, sell, assign, give or otherwise transfer the System or its rights thereto, in whole or in part; ii) modify, disassemble, decompile, reverse engineer, or otherwise re-create the System, in whole or in part; iii) copy or otherwise reproduce the System, in whole or in part; iv) disclose, divulge, or otherwise make available the System, in whole or in part, to any third party; v) develop similar software, services or product offerings substantially similar to the System; or vi) disclose to any third party the payment terms agreed to by [Plaintiff] and Licensee under this Agreement.

23. Each sub-section of Section 3.b. is delineated by small roman numerals i.–vi. and separated by semi-colons. Each sub-section concerns a different prohibition of conduct on the part of the licensee (in this case, Defendant). No one sub-section relies on another sub-section to make its meaning clear. It is generally recognized in legal writing that semicolons are used to separate items in a series, especially when those items are enumerated, *see* BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE §§ 1.19, 1.24(c) (West eds., 3rd ed. 2013), and that the use of commas or semicolons in this context results in divisible provisions, *Premier Res. of N.C., Inc. v. Kelly*, 2014 N.C. App. LEXIS 1411, at *11–12 (N.C. Ct. App. Dec. 31, 2014).

24. For these reasons, the Court concludes that each sub-section, separated by small roman numerals i.–vi. and semicolons, shall be interpreted as standalone protective covenants. Accordingly, the Court addresses each sub-section separately for purposes of evaluating Plaintiff's breach of contract claim.

25. Though there are six sub-sections of Section 3.b., Plaintiff does not allege that Defendant breached Sections 3.b.i. or 3.b.vi. Accordingly, the Court focuses its analysis on Sections 3.b.ii.–v.

### 1. Copyright Preemption

26. Although Defendant did not move for dismissal pursuant to Rule 12(b)(1) or brief the issue of copyright preemption,[1] the Court and counsel discussed at the July 15, 2020 hearing the relationship between Plaintiff's state law claims and federal copyright laws. Claims for breach of software licensing agreements, like Plaintiff's claim here, "raise[] issues that lie at the intersection of copyright and contract law." *SiteLink Software, LLC v. Red Nova Labs, Inc.*, 2018 NCBC LEXIS 90, at \*20 (N.C. Super. Ct. Aug. 20, 2018) (citing *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)). Therefore, as a matter of standing and subject matter jurisdiction, the Court must determine whether part or all of Plaintiff's breach of contract claim is preempted by the United States Copyright Act, 17 U.S.C. § 301(a) (2014) (the "Copyright Act" or the "Act"). State law claims are preempted by the

---

[1] Defendant's counsel argued at the July 15, 2020 hearing that because Defendant's position is that the Restrictive Covenants should be read as a single non-competition agreement, taken as a whole, the Restrictive Covenants prohibit more than mere copying, thereby taking Plaintiff's claim out of copyright preemption. However, Defendant argued that if the Court were to construe each subsection of the Restrictive Covenants as separate, standalone covenants, then a discussion of copyright preemption was necessary.

Copyright Act to the extent that the claims assert rights "equivalent to any of the exclusive rights within the general scope of copyright" granted under the Act. *SiteLink Software,* 2018 NCBC LEXIS 90, at *20.

27. Section 106 of the Copyright Act provides, in pertinent part, that "the owner of copyright . . . has the exclusive rights to . . . [1] reproduce the copyrighted work in copies or phonorecords[;] . . . [2] prepare derivative works based upon the copyrighted work; [and 3] . . . distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership . . . ." 17 U.S.C. § 106(1)–(3). As this Court has reinforced, there are two parts to a court's analysis when considering whether state law claims are preempted by federal copyright law: (1) does the cause of action fall within the subject matter of copyright law, and if so, (2) are the rights protected by state law equivalent to any of the exclusive rights granted by the Copyright Act? *See Out of the Box Developers, LLC v. LogicBit Corp.,* 2012 NCBC LEXIS 55, at *19–20 (N.C. Super. Ct. Oct. 30, 2012) (citing *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 229 (4th Cir. 1993)).

28. As to the first part of this inquiry, here, Plaintiff's breach of contract claim "falls within the subject matter of copyright law" because the allegations are derived from Defendant's alleged misappropriation of Plaintiff's triage nurse contact software, which is an original work of authorship fixed in a tangible medium. This Court has previously held that software programs like Plaintiff's are subject to copyright protection. *See id.* at *20 (citing *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.,* 351 F. Supp. 2d 436, 442 (M.D.N.C. 2005)).

29.     As to the second part of this inquiry, in determining whether the provisions of the Licensing Agreement underpinning Plaintiff's alleged breach of contract claim are "equivalent to any of the exclusive rights granted by the Copyright Act," this Court has consistently drawn upon the Fourth Circuit's articulation of the "extra element" test:

> In order to ascertain whether a specific state cause of action involves a right equivalent to one of those identified in § 106 [of the Copyright Act], reference must be made to the elements of the state cause of action. State law claims that infringe one of the exclusive rights contained in § 106 are preempted by § 301(a) if the right defined by state law "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights. However, "if an 'extra element' is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action . . . there is no preemption,'" provided that "the 'extra element' changes the 'nature of the act so that it is qualitatively different from a copyright infringement claim[.]'"

*Sparrow Sys. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at *13 (N.C. Super. Ct. Dec. 24, 2014) (quoting *Out of the Box Developers,* 2012 NCBC LEXIS 55, at *20 (relying upon fourth circuit case law)).

30.     The "extra element" inquiry can be summed up as this: when you remove the protections affording by the Copyright Act, is there still conduct complained of that would be supported by a separate state law claim?  *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005) (providing an illustration of the extra element test).  With these principles in mind, the Court addresses each subsection of Section 3.b. to determine if any are preempted by federal copyright law.

31.     First, Section 3.b.ii. requires that Defendant refrain from "modify[ing], disassembl[ing], decompiling, reverse engineer[ing] or otherwise re-creat[ing] [Plaintiff's software system], in whole or in part." (Compl. ¶ 18.)  At bottom, Section 3.b.ii. prohibits Defendant from reverse engineering Plaintiff's software.  This Court has recognized that "[r]everse engineering is not within the scope of the exclusive rights of copyright," because it does not constitute "mere copying."  *Sparrow Sys.,* 2014 NCBC LEXIS 70, at *18 (quoting *Meridian Project Sys. v. Hardin Constr. Co. v. Hardin Constr. Co., L.L.C.,* 426 F. Supp. 2d 1101 (E.D. Cal. 2006)); *see also Davidson & Assocs. v. Jung,* 422 F.3d 630, 639 (8th Cir. 2005).  When considering claims of reverse engineering, courts focus on the fact that the defendant, when contracting to purchase a license of a product or service—such as Plaintiff's software product here— relinquished or contracted away their right to reverse engineer the product by entering into an agreement with a covenant against reverse engineering.  *Davidson,* 422 F.3d at 636, 639.  Reverse engineering is one step beyond copying a licensor's product; it instead involves "analyz[ing] a product to learn the details of its design, construction, or production in order to produce a copy or improved version." *SAS Ins., Inc. v. World Programming, Ltd.*, 874 F.3d 370, 381 (4th Cir. 2017).  The result of a reverse engineered product, therefore, is not necessarily an exact replica or "copy" of the licensor's product.  Contracting away this right, thus, is better considered a matter of contract law, not a matter of copyright law.  *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005).

32. Here, Section 3.b.ii. expressly prohibits Defendant from reverse engineering Plaintiff's software, and Plaintiff alleges that Defendant did exactly that when it contracted with PQC Tech, a software developer, to use Plaintiff's product to create a similar software system. (Compl. ¶¶ 25–29.) Accordingly, Plaintiff's claim for breach of contract premised on Section 3.b.ii. includes more than just "mere copying[,]" *Sparrow Sys.*, 2014 NCBC LEXIS 70, at *18, and is therefore not preempted by the Copyright Act.

33. In contrast, Section 3.b.iii. provides that Defendant may not "copy or otherwise reproduce [Plaintiff's software system], in whole or in part[.]" (Compl. ¶ 18). Under the Copyright Act, a holder has exclusive rights to: "reproduce the copyrighted work; copy or distribute the work; prepare derivative works; or display the work publicly." *SiteLink Software*, 2018 NCBC LEXIS 90, at *18 (citing 17 U.S.C. § 106(1)–(4)). Here, Section 3.b.iii. falls squarely within the scope of the Copyright Act, because the act of "copy[ing] or otherwise reproduce[ing]" Plaintiff's software system is nearly verbatim to a copyright holder's exclusive right to reproduce its work pursuant to Section 106(1) of the Act. A claim for breach of Section 3.b.iii. amounts to a claim for copying Plaintiff's software, and nothing more. There is no "extra element" to Defendants' conduct here that would support a breach of contract claim outside the protections afforded by the Copyright Act. *See Madison River Mgmt.*, 351 F. Supp. 2d at 443 (preempting a breach of contract claim that included daily copying of the software database). Accordingly, the Court concludes that Plaintiff's breach of contract claim, to the extent based on a breach of Section 3.b.iii., is preempted by the

Copyright Act. Once it is determined that a state law claim is preempted by federal copyright law, the state court lacks jurisdiction to consider the claim and it must be dismissed for failure to state a claim. *See WJ Global LLC v. Farrell*, 941 F. Supp. 2d. 688, 694 (2013). Therefore, to the extent that Plaintiff's breach of contract claim is based on Defendant's breach of Section 3.b.iii., the claim is DISMISSED.

34. Section 3.b.iv. provides that Defendant may not "disclose, divulge, or otherwise make available [Plaintiff's software system], in whole or in part, to any third party[.]" (Compl. ¶ 18.) Breach of this provision is akin to Section 106(3) of the Copyright Act, which gives the copyright holder the exclusive right to "distribute copies or phonorecords of the copyrighted work . . . ." 17 U.S.C. § 106(3). In *Out of the Box Developers*, Judge Gale of this Court confronted a similar provision in a license agreement, which prohibited the "transfer [of] any copy of the [software] System without the express prior written consent" of the licensor (the "Transfer Provision"). *Out of the Box Developers*, 2012 NCBC LEXIS 55, at *27. The plaintiff there claimed that the defendant breached the Transfer Provision by providing an unauthorized copy of the plaintiff's software file to another defendant, and argued that a claim based on this breach was not preempted because "there is no transferring right in the bundle of rights under the Copyright Act." *Id.* at *28. Instead, the plaintiff argued that Section 106(3) should be construed narrowly to only apply to "distribution for profit or to change ownership[,]" not to distribute to another party for purposes of creating a competing product. *Id.*

35. This Court was unpersuaded by this argument, finding, in part, that another provision in the license agreement—which expressly prohibited the defendant from engaging in anticompetitive behavior—did have an "extra element" but that the Transfer Provision did not. *Id.* at *29–30. The Court concluded that to prove breach of the Transfer Provision, all the plaintiff needed to show was that the defendant furnished a copy of the plaintiff's software file to another person, which is an act that "without further proof constitute[s] copyright infringement under Section 106(3)." *Id.* at *30.

36. The same rationale applies here. Based on the language of Section 3.b.iv., the purpose for which Defendant gave a copy of Plaintiff's software to PQC Tech is not a necessary element to properly alleging breach of Section 3.b.iv. Rather, consistent with the two elements for asserting a breach of contract claim long-recognized by our Courts, *see Poor*, 138 N.C. App. at 26, 530 S.E.2d at 843, all Plaintiff would need to allege is that Defendant did, in fact, "disclose, divulge, or otherwise make available" Plaintiff's software to a third party. (Compl. ¶ 18.) This squarely falls within Section 106(3), and accordingly, a claim based on breach of this provision is preempted. Like with Section 3.b.iii., the Court lacks jurisdiction to consider a breach of contract claim predicated on breach of Section 3.b.iv., and therefore this claim is DISMISSED in this regard.

37. Lastly, Section 3.b.v. prohibits Defendant from "develop[ing] similar software, services or product offerings substantially similar to [Plaintiff's software system]." Like the Court's analysis regarding Sections 3.b.ii., success on the merits

of Plaintiff's breach of this section would require proof of an extra element: that Defendant did, in fact, cause software to be developed for the purposes of competing with Plaintiff. A claim predicated on the creation of new software to directly compete with Plaintiff likely goes beyond the bundle of rights and protections afforded by the Copyright Act.

38. *Out of the Box Developers* is instructive here as well. In addition to the provision discussed in paragraphs 34 and 35 above, the license agreement at issue in that case also had a provision that prohibited the defendant from using the software system "for the purpose of . . . competing with [the plaintiff]." *Id.* at *26. Judge Gale determined that to succeed on its breach of contract claim for the alleged conduct, the plaintiff had to prove more than just copying or decompiling plaintiff's software, but that this conduct was done for the purposes of competing with the plaintiff. *Id.* at *30. The Court concluded, therefore, that breach of this provision of the license agreement was "not the equivalent of [] copyright protection and [was] thus not preempted" because of this necessary additional proof element. *Id.* at *30. Likewise, the Court concludes here that proving breach of Section 3.b.v. requires proof of an "extra element" that takes Plaintiff's claim predicated on this provision out of copyright preemption: that Defendant used Plaintiff's software to engage in competitive conduct.

39. Having determined that Plaintiff's contract claim based on Defendant's alleged breach of Sections 3.b.ii. and 3.b.v. are not preempted by federal copyright law, the Court next considers whether Plaintiff has sufficiently alleged conduct

amounting to a breach of each of these provisions. The Court addresses each subsection separately below.

### 2. Breach of Section 3.b.ii.

40. As noted above, Section 3.b.ii. requires that Defendant refrain from "modify[ing], disassembl[ing], decompiling, reverse engineer[ing] or otherwise re-creat[ing] [Plaintiff's software system], in whole or in part." (Compl. ¶ 18.) Defendant contends that the Restrictive Covenants should be read as a single covenant, and therefore the Motion and briefing in support thereof hones in on the anti-competitive language in Section 3.b.v., arguing that the Restrictive Covenants are "a naked restraint of trade and unenforceable under North Carolina law." (Br. in Supp. Mot. 4.) In essence, Defendant argues that the Restrictive Covenants should be construed and interpreted consistent with North Carolina non-compete law.

41. When considering Section 3.b.ii., however, the Court is not dealing with a prohibition against competition, but with a bundle of rights afforded, or not afforded, to Defendant pursuant to the Licensing Agreement. Our Courts, and federal courts sitting in this State applying North Carolina law, consider the sufficiency of reverse engineering claims based on general contract interpretation law. *See Sparrow Sys.*, 2014 NCBC LEXIS 70, at *38 (focusing on issues of mutual assent when determining the legal sufficiency of the plaintiffs' claims); *SAS,* 874 F.3d at 380 (discussing the definitiveness of contract terms bearing striking similarity to those in this case).

42. Section 3.b.ii. is, in the most traditional sense, a basic contract provision that Defendants' breach thereof would be sufficient to withstand scrutiny on a Rule

12(b)(6) motion. Here, Plaintiff alleges that Defendant breached Section 3.b.ii. by contracting with a third party, PQC Tech, "to create" a software package that "mimicked" Plaintiff's product. (Compl. ¶ 25.) Plaintiff alleges that Defendant provided PQC Tech with access to Plaintiff's software during the term of the Licensing Agreement so that it could develop and recreate a similar product to be used to compete with Plaintiff's product. (Compl. ¶¶ 28–29.) Section 3.b.ii. expressly prohibits Defendant from re-creating Plaintiff's software system. (Compl. ¶ 18.) Accordingly, Plaintiff has sufficiently alleged a breach of this contract provision to withstand dismissal at this time.

### 3. Breach of Section 3.b.v.

43. Plaintiff also alleges breach of Section 3.b.v. of the Licensing Agreement, which prohibits Defendant from "develop[ing] similar software, services or product offerings substantially similar to the System." (Compl. ¶ 18.) Specifically, Plaintiff alleges that Defendant "developed similar software substantially similar to TLMC's software packages." (Compl. ¶ 29.) Defendant's chief argument for dismissal of Plaintiff's breach of contract claim stems from its interpretation that Section 3.b.v is an agreement not-to-compete that is neither reasonable as to time or territory and therefore violates North Carolina public policy as an illegal restraint on trade. (Br. in Supp. 4–8; Reply Br. 4–5.)

44. In support of its position, Defendant cites North Carolina cases dealing with non-competes in the employment context. Non-competition agreements of this type are closely scrutinized because they prohibit an employee from working for a

competing business to his or her former employer for a certain duration of time, ranging from months to years, and covering a certain geographic area. *See Outdoor Lighting Perspectives Franchising v. Harders*, 228 N.C. App. 613, 620, 747 S.E.2d 256, 262 (2013). Given the drastic nature of employment non-competition agreements, our Courts analyze time and territory restrictions "in tandem" so that the combination of both together is not an unreasonable restraint on the employee's ability to seek new employment. *Market Am., Inc. v. Christman-Orth.*, 135 N.C. App. 143, 152, 520 S.E.2d 570, 577–78 (1999). The restrictions must be no longer and no wider in scope than necessary to protect the former employer's legitimate business interests. *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979).

45. Notwithstanding the heavy scrutiny non-competition agreements receive in the employment context, there is another line of cases in North Carolina discussing the reasonableness of non-competition agreements related to the sale of a business. There, our Courts have enforced decades-long non-competes. *See Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 664, 158 S.E.2d 840, 843–44 (1968) (citing a string of North Carolina supreme court cases where sale-of-business non-competes ranging from ten years to life were upheld as valid and enforceable).

46. In contrast, the non-competition agreement at issue in this case—a licensing agreement—is fundamentally different from non-competition agreements in either the employment or sale-of-business context. The sale-of-business line of cases is perhaps the closer analogy, because both the sale of a license and the sale of

a business involve the purchasing of certain "sticks" in the proverbial "bundle." However, even in the sale-of-business context, the purchaser of a business is paying for the entire bundle of sticks, whereas, in the license context, the licensor still retains ownership rights. A license is, by definition, a limited right of use. *License, Black's Law Dictionary* (10th ed. 2014) ("A permission, usually revocable, to commit some act that would otherwise be unlawful[.]"). As Plaintiff argued at the July 15, 2020 hearing, Defendant could have negotiated—and paid more—for more rights and less limitations on its use of Plaintiff's software, such as the right to own or reproduce Plaintiff's software.

47. In sum, the Court is not convinced that it should determine the enforceability of Section 3.b.v. with firm adherence to non-compete law in the employment or sale-of-business contexts. In fact, our Court of Appeals has cautioned against applying these legal frameworks with "unbending rigidity" to contexts outside the employer-employee or buyer-seller contexts. *See Outdoor Lighting,* 228 N.C. App. at 622, 747 S.E.2d at 263; *see also KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72 (N.C. Super. Ct. Oct. 9, 2019) (summarizing *Outdoor Lighting* and applying the court's rationale to a non-competition agreement in a context outside the employer-employee or buyer-seller relationship). "Ultimately, 'the reasonableness of a restraining covenant is a matter of law for the court to decide.'" *KNC Techs.*, 2019 NCBC LEXIS, at *17 (quoting *Jewel Box Stores Corp.,* 272 N.C. at 663, 158 S.E.2d at 843).

48.     In determining the reasonableness of Section 3.b.v., and absent any other applicable controlling law in North Carolina, the Court finds the Fourth Circuit's decision in *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (1990) instructive.  There, on appeal from a Middle District of North Carolina judgment, the Fourth Circuit had to determine for the first time whether misuse of copyright was a valid defense to a copyright infringement claim.  *Id.* at 973–74.  As stated by the court, "[a] successful defense of misuse of copyright bars a culpable plaintiff from prevailing on an action for infringement of the misused copyright."  *Id.* at 972.  In that case, the defendants claimed the plaintiff misused its copyright by including in its licensing agreement an overly broad non-competition agreement.  *Id.* at 972–93.  Based on the language in the licensing agreement, the licensee was barred from competing with the licensor for the term of the license agreement and one year thereafter.  *Id.* at 973.  In effect, this was a non-competition term of ninety-nine years.  *Id.*

49.     Drawing on comparable law in the patent misuse context, the Fourth Circuit concluded that an agreement not-to-compete for ninety-nine years could extend beyond the life of the copyright itself, and the need to protect one's investment in their intellectual property does not outweigh the public's right to compete in the marketplace after a reasonable restrictive period.  *Id.* at 978–79 (citing *Compton v. Metal Products, Inc.*, 453 F.2d 39 (4th Cir. 1971)).  The court reached this conclusion by drawing on antitrust law, noting that while copyright misuse involves a separate analysis, the two are "'similar" to one another.  *Id.* at 979.

50. Section 3.b.v. is even more restrictive than the non-competition agreement in *Lasercomb*. Here, there is no end date for the non-competition provision, resulting in an agreement by Defendant to never compete with Plaintiff. Plaintiff makes this point clearer by alleging that pursuant to Section 7.c. of the Licensing Agreement, "the Protective Covenants survive the end of the license term." (Compl. ¶ 22.)

51. An indefinite and perpetual restraint on trade in the context of a software licensing agreement seems to be counter to the antitrust laws of this State. While a licensing agreement involves some nuance that separates it from non-competition agreements in the employment or sale-of-business contexts, the Court concludes that even in the context of a limited use agreement, a time restriction of some reasonable duration is needed so as to not inhibit free trade in this State. Accordingly, the Court concludes that Section 3.b.v. is unreasonable and unenforceable as a matter of law, and Plaintiff has therefore failed to state a breach of contract claim based on this specific provision of the Licensing Agreement. The Motion, therefore, is GRANTED in this regard.[2]

B. **Common Law Unfair Competition**

52. In the alternative to its breach of contract claim, Plaintiff asserts a claim for common law unfair competition. (Compl. ¶¶ 39–41.) As with Plaintiff's breach of

---

[2] Although the Court strikes this provision as unreasonable and unenforceable, the Court determines, in its discretion, for the reasons stated in paragraphs 22 through 24 of this Order and Opinion, that Section 3.b.v. is divisible and therefore, pursuant to the "blue pencil rule" recognized by the courts of this State, the Court may still enforce the reasonable provisions of Section 3.b, namely Section 3.b.ii, such that Plaintiff's breach of contract claim premised on breach of Section 3.b.ii. may go forward. *See Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 696–97, 784 S.E.2d 457, 460 (2016).

contract claim, the Court first analyzes whether Plaintiff's unfair competition claim is preempted by the Copyright Act. The Court concludes that it is not. First, some courts addressing this preemption issue have determined that a claim brought in the alternative to a breach of contract claim will survive preemption if the breach of contract claim also survives preemption. *See, e.g. Forest2Market v. Am. Forest Mgmt.*, 2008 U.S. Dist. LEXIS 33185, at *16–17 (W.D.N.C. 2008) (concluding that it was unnecessary to address the viability of an unjust enrichment claim brought in the alternative to a breach of contract claim where the breach of contract claim was not preempted); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 927 (4th Cir. 1988) (concluding same).

53. Moreover, applying the "extra element" test to a common law unfair competition claim warrants the same conclusion. To succeed on its unfair competition claim, Plaintiff must prove additional elements that go beyond those required to prove a copyright claim under federal copyright law. This Court has previously stated that "[t]he standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different from a claim for unfair or deceptive trade practices." *Global Textile Alliance, Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at *23 (N.C. Super. Ct. Oct. 8, 2018) (citing *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999)). And in *Sparrow Systems*, Chief Judge Bledsoe of this Court, drawing on federal copyright preemption cases, determined that a UDTP claim is not preempted by federal copyright law because such a claim requires the proof of additional elements "such as

misrepresentation and deceitful conduct." *Sparrow Sys.*, 2014 NCBC LEXIS 70, at *29.

54. Likewise, a claim for common law unfair competition requires the plaintiff to prove that the defendant engaged in an act or practice that misappropriates the plaintiff's "competitive advantage earned through organization, skill, labor, and money." *Gateway Mgmt. Servs. v. Carrbridge Berkshire Grp., Inc.*, 2018 NCBC LEXIS 45, at *19 (N.C. Super. Ct. May 9, 2018) (quoting *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749, 488 S.E.2d 234, 239–40 (1997)). This "extra element" required to prove Plaintiff's unfair competition claim is sufficient to take this claim out of copyright preemption.

55. Concluding that Plaintiff's unfair competition claim is not preempted, the Court next considers the sufficiency of Plaintiff's allegations. "Traditionally at common law, including that of North Carolina, the tort of unfair competition has consisted of acts or practices by a competitor which are likely to deceive the consuming public." *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1320 (M.D.N.C. 1983) (citing *Charcoal Steak House of Charlotte, Inc. v. Staley*, 263 N.C. 199, 139 S.E.2d 185 (1964)). "The gravamen of unfair competition is the protection of a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson*, 346 N.C. at 749, 488 S.E.2d at 239–40. Unfair competition has been found to encompass a range of behaviors "such as trademark infringement, imitation of a competitor's product or its appearance, interference with a competitor's contractual relations, disparagement of a competitor's product or

business methods, and misappropriation of a competitor's intangible property rights such as advertising devices or business systems." *Stearns*, 564 F. Supp. at 1320. In North Carolina, "common law unfair competition claims are limited to claims between business competitors . . . ." *Gateway*, 2018 NCBC LEXIS 45, at \*18.

56. Here, although Plaintiff alleges that Defendant misappropriated its commercial advantage by contracting with PQC Tech and disclosing Plaintiff's software to PQC Tech, nowhere in the Complaint does Plaintiff allege that Defendant was its competitor. In fact, Plaintiff alleges that PQC Tech is the owner and marketer of the competing software package. (Compl. ¶¶ 26–27.) This failure is fatal to Plaintiff's common law unfair competition claim, and for this reason, the claim must be dismissed.

57. Moreover, Plaintiff does not explain anywhere within the Complaint how Defendant's software deceived the public, an essential basis upon which an unfair competition claim lies. *See Staly*, 263 N.C. at 203, 139 S.E.2d at 188 ("Unfair competition is the child of confusion" (internal quotations and citation omitted).) Plaintiff has alleged no consumer confusion or deception between Plaintiff's Easy Read Screen and the On-Call Hub. For this additional reason, Plaintiff's common law unfair competition claim should be dismissed.

58. Notwithstanding the Court's conclusion that Plaintiff's common law unfair competition claim should be dismissed, "[t]he decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). The Court concludes, in the

exercise of its discretion, that Plaintiff's claim for common law unfair competition should be dismissed without prejudice to Plaintiff's right to attempt to reassert this claim through proper factual allegations by way of a motion to amend.

## V.    CONCLUSION

59.    **THEREFORE**, based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as set forth below:

A.    The Motion is **GRANTED** in part as to Plaintiff's breach of contract claim premised on breach of Section 3.b.iii., Section 3.b.iv., and Section 3.b.v. of the Licensing Agreement.  Otherwise, the Motion is **DENIED** as to Plaintiff's breach of contract claim, and this claim goes forward.

B.    The Motion is **GRANTED in part** as to Plaintiff's common law unfair competition claim.  This claim is **DISMISSED**, but the dismissal is **WITHOUT PREJUDICE.**

SO ORDERED, this the 11th day of August, 2020.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases